FEDERAL POWER COMMISSION *v.* LOUISIANA
POWER & LIGHT CO. ET AL.

No. 71–1016.   Argued April 19, 1972—Decided June 7, 1972*

*Together with No. 71–1040, *United Gas Pipe Line Co. et al.* v.
*Louisiana Power & Light Co. et al.*, on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which all members joined except STEWART, J., who took no part in the decision of the cases, and POWELL, J., who took no part in the consideration or decision of the cases.

*Gordon Gooch* argued the cause for petitioner in No. 71–1016. With him on the briefs were *Solicitor General Griswold, Samuel Huntington, Leo E. Forquer, J. Richard Tiano,* and *George W. McHenry. William C. Harvin* argued the cause for petitioners in No. 71–1040. With him on the briefs were *William R. Choate, Perry O. Barber, Jr., Jeron Stevens, W. DeVier Pierson,* and *William B. Cassin.*

*Andrew P. Carter* argued the cause for respondent Louisiana Power & Light Co. With him on the brief was *Thomas W. Leigh.*

Briefs of *amici curiae* urging reversal were filed by *J. Lee Rankin, Stanley Buchsbaum,* and *Francis I. Howley* for the City of New York; by *Peter H. Schiff* for the Public Service Commission for the State of New York; by *J. Evans Attwell, Christopher T. Boland, Robert O. Koch, John J. Mullally,* and *William W. Brackett* for the Pipeline Intervenors; by *Howard E. Wahrenbrock* and *John M. Kuykendall, Jr.,* for Mobile Gas Service Corp. et al.; by *Barbara M. Gunther* for Brooklyn Union Gas Co.; and by *Richard A. Rosan* and *Daniel L. Bell, Jr.,* for Columbia Gas Transmission Corp.

Briefs of *amici curiae* urging affirmance were filed by *John J. McKeithen,* Governor, *Jack P. F. Gremillion,* Attorney General, *Fred G. Benton, Sr.,* and *Arnold D. Berkeley* for the State of Louisiana; by *Pat Moran* for the Arkansas Public Service Commission; by *Martin N.*

*Erck, John R. Rebman, Kirby Ellis, Sherman S. Poland,*
and *Daniel F. Collins* for Humble Oil & Refining Co.;
by *Thomas G. Johnson* for Shell Oil Co.; and by *J. Donald
Annett, Kirk W. Weinert,* and *John M. Young* for Texaco
Inc.

Briefs of *amici curiae* were filed by *Albert G. Norman,
Jr., John W. Hinchey,* Assistant Attorney General of
Georgia, *John E. Holtzinger, Jr.,* and *Allen E. Lockerman*
for Atlanta Gas Light Co. et al., and by *John T. Miller,
Jr.,* for Monsanto Co. et al.

MR. JUSTICE BRENNAN delivered the opinion of the
Court.

In April 1971 the Federal Power Commission (FPC)
promulgated its Order No. 431 requiring every jurisdic-
tional pipeline to report to the FPC whether curtailment
of its deliveries to customers would be necessary because
of inadequate supply of natural gas. A pipeline antici-
pating the necessity for curtailment was required to file
a revised tariff to control deliveries to *all* customers—
industrial "direct sales" customers, purchasing gas for
their own consumption, and "resale" customers, pur-
chasing gas for distribution to ultimate consumers.
The principal question here is whether the proviso
to § 1 (b) of the Natural Gas Act, 52 Stat. 821, 15 U. S. C.
§ 717, prohibits the FPC from applying its Order No. 431
to curtail direct-sales deliveries in times of natural gas
shortage. Section 1 (b) provides:

"The provisions of this Act shall apply to the
transportation of natural gas in interstate commerce,
to the sale in interstate commerce of natural gas
for resale for ultimate public consumption for do-
mestic, commercial, industrial, or any other use, and
to natural-gas companies engaged in such transporta-
tion or sale, *but shall not apply to any other trans-*

*portation or sale of natural gas* or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." (Emphasis supplied.)

A subsidiary question presented is whether the doctrine of primary jurisdiction obliged the federal courts in this case to defer to the FPC for an initial determination of FPC jurisdiction to certificate a particular pipeline delivery when a certification proceeding to determine that question was pending before the Commission.

The Court of Appeals for the Fifth Circuit held that the proviso of § 1 (b) prohibited application of FPC curtailment regulations to direct sales deliveries, and held, further, that neither that court nor the District Court was obliged to defer to the FPC's pending certification proceeding. 456 F. 2d 326 (CA5 1972). We granted certiorari, 405 U. S. 973 (1972). We reverse.

I

Respondent Louisiana Power & Light Co. (LP&L) generates electricity at Sterlington-Electric Generating Station in Ouachita Parish, Louisiana, and at Nine-Mile Point Generating Station in Jefferson Parish, Louisiana. The natural gas burned under LP&L's boilers at both stations is purchased from United Gas Pipe Line Co. (United), a petitioner in No. 71–1040, under direct-sales contracts of long standing. The sales to Sterlington Station are sales of interstate gas, initially certificated by the FPC. Sales to Nine-Mile Point Station had been wholly intrastate gas delivered from United's intrastate "Green System" when, in 1970, United diverted 2.6% of the gas from its interstate "Black System" into the intrastate "Green System," after which United sought FPC certification of the "Green System." In 1970 also, United, from concern that its gas supply

during the 1970–1971 heating season would fall short of demand, sought a declaratory order from the FPC to approve a proposed program of curtailment of natural gas deliveries to both its direct and resale customers. This proceeding culminated in agreement among affected customers under which FPC allowed United to carry out its program for the 1970–1971 winter.

When, however, United made a supplemental filing in February 1971, for a proposed curtailment program for the 1971 summer season, LP&L, in March 1971, filed this diversity action in the District Court for the Western District of Louisiana, alleging that the program was a breach of its contracts with United and asking injunctive relief against its implementation. LP&L also asked for a judgment declaring that the "Green System" was an intrastate system, deliveries from which did not require FPC certification. The FPC and United sought dismissal of the action on the ground that a prior decision by the District Court would be destructive of the FPC's primary jurisdiction since the FPC was, in fact, asserting its jurisdiction over both issues at that time and was promulgating its Order No. 431, and United, in response to Order No. 431, was filing its third curtailment plan.

In opposition to the motions to dismiss in the District Court, LP&L argued that the FPC was without jurisdiction to authorize or approve curtailment programs affecting direct-sales deliveries and was also without jurisdiction to curtail deliveries to Nine-Mile Point Station because they were local and not interstate deliveries. On June 30, 1971, the District Court dismissed the action, holding that the FPC had jurisdiction of both curtailment and certification proceedings and that LP&L had to exhaust its administrative remedies in both, 332 F. Supp. 692 (1971). The Court of Appeals decision reversed this dismissal.

## II

United is a "jurisdictional" pipeline [1] purchasing gas from producers in Texas and Louisiana and supplying wholesalers, direct-sales customers, and other pipelines. United supplies ultimate consumers throughout the eastern half of the United States from Texas to Massachusetts with a peak-day commitment in the winter heating months totaling about 6,000,000 thousand cubic feet (Mcf).

In 1970, as part of a pattern of temporary and chronic natural gas shortages throughout the Nation,[2] United found itself unable to meet all of its contract commitments during peak demand periods.[3] Indeed, on

---

[1] A "jurisdictional" pipeline transports natural gas in interstate commerce and for that reason is subject to FPC certification jurisdiction. The "jurisdictional" label is also sometimes used to apply to sales, in which case it refers to interstate sales for resale, which are subject to Commission rate regulation.

[2] FPC Staff Report No. 2, National Gas Supply and Demand 1971–1990 (1972):

"The emergence of a natural gas shortage during the past two years marks a historic turning point—the end of natural gas industry growth uninhibited by supply considerations. Not only has the Nation's proven gas reserve inventory for the lower 48 states been shrinking for the past three years, but major pipeline companies and distributors in most parts of the country have been forced to refuse requests for additional gas service from large industrial customers and from many new customers. For practical short-term purposes we are confronted with the fact that current proven reserves in the lower 48 states, as reported by the American Gas Association, have dropped from 289.3 trillion cubic feet in 1967 to 259.6 in 1970, a 10.3 percent drop within a three-year period. Furthermore, approximately 95 percent of this proven reserve inventory is already committed to gas sales contracts and is therefore unavailable for sales to new customers or for increased volumes to old customers." *Id.*, at xi.

[3] Demand for natural gas fluctuates sharply from season to season and from day to day. Nationally, peak days occur in winter heating

days of greatest use, United expected to fall short by as much as 20% or more.[4] In October 1970 United first promulgated a proposed delivery curtailment plan and sought a declaratory order from the FPC that the plan was consistent with United's obligations under its tariff and direct-sales contracts.[5] Many of United's contracts with its customers made some provision for curtailment in times of temporary shortage, but these terms were complex and were not identical in all contracts or in United's tariff filings with the Commission.[6] United's proposed curtailment plan established a priority system of three groups, curtailed on the basis of end use. These three groups were, in order of the lowest priority and curtailed first, gas used for industrial purposes, including gas to generate electricity for industrial purposes; gas used to generate electricity consumed by domestic consumers; and gas used by domestic consumers. See *United Gas Pipe Line Co.*, F. P. C. Op. No. 606, Oct. 5, 1971. The plan made no distinction between direct-sales customers and resale customers.

---

months. For LP&L, however, the need for gas is greatest in the summer months, when air conditioning increases electricity consumption.

[4] Many of the facts are taken from the recitals in the petitions for certiorari, which draw upon evidence presented before the FPC in the curtailment proceedings. LP&L has not challenged their accuracy except to argue that no significant gas shortage actually exists. Our decision in this case in no way limits LP&L's freedom to argue its position as to the facts on the appeal pending in the Court of Appeals.

[5] The Commission has authority to issue declaratory orders under the Administrative Procedure Act, 5 U. S. C. § 554 (e).

[6] The record in these cases does not contain all the contract terms dealing with curtailment of deliveries. United's two contracts with LP&L under consideration in this litigation, however, indicate that the terms vary from year to year and customer to customer since these two contracts themselves establish slightly different priority systems. Moreover, LP&L informs us that its contracts had terms slightly different from those in most other direct-sales contracts.

This plan was opposed by LP&L and others, primarily on the ground that the FPC had no jurisdiction to curtail deliveries under direct-sales contracts. While preserving their objections, all but one of United's customers [7] agreed to a modified plan to go into effect for the 1970–1971 winter season while the proceedings continued.

During this same season, many other pipelines reported serious shortages and applied to the FPC for assistance in effecting curtailment plans. In response, the FPC promulgated several emergency provisions for temporary measures to avoid major disruptions of power supplies. Orders Nos. 402, 35 Fed. Reg. 7511, and 402A, 35 Fed. Reg. 8927, authorized short-term purchases by pipelines facing shortages from other jurisdictional pipelines to ensure that storage fields were filled. Order No. 418, 35 Fed. Reg. 19173, authorized similar emergency purchases from producers without following usual procedures.

It was because these measures were found to be insufficient that the FPC promulgated Order No. 431, 36 Fed. Reg. 7505. The Order recommended that in filing the required tariff revisions, "[c]onsideration should be given to the curtailment of volumes equivalent to all interruptible sales and to the curtailment of large boiler fuel sales where alternate fuels are available." Finally, Order No. 431 provided:

"Jurisdictional pipelines have the responsibility in the first instance to adopt a curtailment program by filing appropriate tariffs. Such tariffs, if approved by the Commission, will control in all respects notwithstanding inconsistent provisions in sales contracts, jurisdictional and nonjurisdictional, entered into prior to the date of the approval of the tariff."

---

[7] The objecting party appealed the decision of the FPC and that case is now pending in the District of Columbia.

United's revised tariff program filed in compliance with this order immediately became subject to the pending hearing for a declaratory order. On October 5, 1971, the FPC announced its interim decision, Op. No. 606, finding jurisdiction to effect a curtailment program for all customers, revising United's latest filing slightly, and remanding other issues in the plan to a hearing examiner. On November 2, 1971, United's plan, as modified, went into full effect. The appeal of LP&L and others from the FPC decision, Op. No. 606, is pending in the Court of Appeals for the Fifth Circuit.[8]

Also, in October 1970, based on the introduction of the interstate gas from its Black System, United sought certification under § 7 (c)[9] for the continued operation of the portion of its pipeline facilities in Louisiana (the Green System) used to supply LP&L's Nine-Mile Point generating station. LP&L opposed the application, alleging that the pipeline was constructed and operated to be wholly intrastate, and that United's "illegal" introduction of a very small quantity of interstate gas did not cause the whole system to come under Commission jurisdiction.

On February 9, 1972, the Commission found in Op. No. 610 that the Green System was within its jurisdiction and thus required certification; it remanded the

---

[8] The petitions of the Solicitor General and United for review here of the FPC decision prior to judgment of the Court of Appeals were denied. 405 U. S. 973 (1972).

[9] Section 7 (c) provides:

"No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . ." 15 U. S. C. § 717f (c).

proceedings to a trial examiner to determine if the certificate should be granted under the "public convenience and necessity" standard of § 7.

The Court of Appeals' reversal of the District Court [10] on the curtailment issue rested on its view that under the Natural Gas Act ". . . FPC has no form of continuing certificate jurisdiction over direct sales to customers of interstate pipeline companies. It has the initial right to issue or veto a certificate of public convenience and necessity and it must give its approval to the abandonment of the use of the certificated facilities, but between the two functions the express exemption [in the proviso of § 1 (b)] of regulatory power over such consumptive sales bars agency intervention." 456 F. 2d, at 338.

The Court of Appeals' holding that United's injection of interstate gas from its Black System into the theretofore intrastate Green System did not establish FPC jurisdiction to certificate the Green System, rested on its finding that the record showed that "the flow of gas from the Black system into the Green system in the case at bar is occasional and irregular, as well as minimal. The Green system, as an entire and separate unit, is physically located and functions entirely in Louisiana. Therefore, the undisputed facts show that the channel of constant flow is an intrastate and not an interstate channel. The regulation of the Green system is substantially and essentially a localized matter committed to Louisiana's jurisdiction." 456 F. 2d, at 339-340.

---

[10] Argument was heard in the Fifth Circuit in November 1971, one month after the FPC decision in No. 606. The Court of Appeals decision was announced in January 1972, one month before the FPC decision in No. 610.

## III

The Natural Gas Act of 1938 granted FPC broad powers "to protect consumers against exploitation at the hands of natural gas companies." *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610 (1944). See *FPC* v. *Transcontinental Gas Pipe Line Corp.,* 365 U. S. 1, 19 (1961); *Sunray Mid-Continent Oil Co.* v. *FPC,* 364 U. S. 137, 147 (1960). To that end, Congress "meant to create a comprehensive and effective regulatory scheme," *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 520 (1947), of dual state and federal authority. Although federal jurisdiction was not to be exclusive, FPC regulation was to be broadly complementary to that reserved to the States, so that there would be no "gaps" for private interests to subvert the public welfare. This congressional blueprint has guided judicial interpretation of the broad language defining FPC jurisdiction, and

> "when a dispute arises over whether a given transaction is within the scope of federal or state regulatory authority, we are not inclined to approach the problem negatively, thus raising the possibility that a 'no man's land' will be created. Compare *Guss* v. *Utah Labor Board,* 353 U. S. 1. That is to say, in a borderline case where congressional authority is not explicit we must ask whether state authority can practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." *FPC* v. *Transcontinental Gas Pipe Line Corp., supra,* at 19–20.

This litigation poses the question whether FPC has authority to effect orderly curtailment plans involving both direct sales and sales for resale. LP&L insists that

the FPC has no power to include direct sales in these plans. *Transcontinental* counsels inquiry into the necessary consequences of that contention in terms of the scope of federal and state regulatory authority in the premises.

Thirty-seven percent of United's total sales in 1970 were direct industrial sales. Under LP&L's argument, this volume would be wholly exempt from any curtailment plan approved by the FPC and thus United's resale customers would be forced to accept the entire burden of sharply reduced volumes while direct-sales customers received full contract service. The ultimate consumers thus affected include schools, hospitals, and homes completely dependent on a continued natural gas supply for heating and other domestic uses. These resale consumers could be curtailed by as much as 560,000 Mcf on cold days without dire consequences, but burdening them with the full curtailment volume would deprive them of up to 1,500,000 Mcf.

From a practical point of view, LP&L's position may thus produce a seriously inequitable system of gas distribution. Many direct industrial users of gas require only "interruptible services," which by the terms of their contracts are recognized to be of such minimal importance to the user that, upon the happening of certain events, the supply can be shut off on little or no notice. Nevertheless, the need for curtailment may not be sufficient to trigger these provisions of the contract and interruptible service customers may be able to demand full contract gas while resale consumers are being drastically curtailed. Many other direct industrial sales customers have alternative means available at little or no additional cost, yet under LP&L's contention will be able to demand their contract volumes while homes, hospitals, and schools suffer from lack of adequate service.

Can state authority practicably regulate in this area to prevent this inequity and hardship? Insofar as state

plans purport to curtail deliveries of interstate gas, *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), is authority that such plans, when they operate to withdraw a large volume of gas from an established interstate current whereby it is supplied to customers in other States, would constitute a prohibited interference with interstate commerce. But even to the extent the States may constitutionally promulgate curtailment plans, the inevitable result would be varied regulatory programs of state courts and agencies, interpreting a countless number of different contracts and applying a variety of state agency rules. The conflicting results would necessarily produce allocations determined simply by the ability of each customer to pump its desired volume from a pipeline. Moreover, in some States, Louisiana for example, the state regulatory agency is forbidden to regulate direct-sales contracts.[11] Besides, a state agency empowered to regulate these contracts would be obliged to regulate in the State, not the national interest.[12] Cf. *Pennsylvania* v. *West Virginia, supra.* The unavoidable conflict between producing

---

[11] La. Const., Art. 6, § 4.

[12] The conflict between producing and consuming States over state or federal regulatory authority is highlighted in the contrast between Louisiana's *amicus* brief in this litigation and the statement of the Chairman of the New York Public Service Commission in another case. Louisiana, a producing State, submits:

"Historically, gas producing states have certain advantages over states which do not have their own gas supply. Their very proximity to the source of production attracts industries which use gas as the raw material without which their plants could not operate. The lower transportation costs of delivering gas to other industrial and commercial users within the state makes its use particularly attractive for such applications. It is not surprising, therefore, that producing states have a higher proportion of industrial-commercial consumption of total gas consumed and of firm gas than consuming states. Louisiana utilizes 84% of the total quantity of firm gas sold

States and consuming States will create contradictory regulations that cannot possibly be equitably resolved by the courts. With these problems in mind, the de-

in the state for industrial and power plant generation purposes, in comparison to a national average of only 37%.

"Louisiana's economy is heavily dependent upon the availability of a firm, reliable and uninterrupted supply of natural gas. State-wide investment by industrial category clearly reflects the predominance of petroleum, refineries and chemicals which represented $465,297,370 or 76% of a total industrial investment of $609,578,850 in 1970. Apart from these industries which use natural gas as process gas without which their plants cannot function, the state's electric utilities are completely dependent upon natural gas as fuel for electric generators.

"Thus, the economic welfare of the state hinges upon the continued delivery of the volumes of gas it received and used prior to United's curtailment and upon the ability to draw upon greater volumes. Otherwise, its economy will be frozen at or below its present level. This is not true of other states in which natural gas plays a subsidiary rather than a dominant role in the overall economy of the state and in which the electrical utilities have alternate power sources such as coal, imported liquefied natural gas and inexpensive hydroelectric power." Brief of State of Louisiana Amicus Curiae 2–3.

As observed in FPC v. Transcontinental Gas Pipe Line Corp., 365 U. S. 1 (1961), consuming States prefer federal regulation. The Chairman of the New York Public Service Commission summed up this position in In re Cabot Gas Corp., 16 P. U. R. (N. S.) 443 (1936):

"There can be but one opinion among those who believe in the conservation of natural resources. They should be developed not to benefit a few individuals but in the interests of public welfare present and future. Our natural gas resources ought to be conserved and there is probably no field where the Federal government acting in the interests of the entire country and to protect the welfare of the future could accomplish more than in the natural gas industry. From a conservation viewpoint, I thoroughly agree with Commissioner Burritt, and if I could see how a denial of the present petition would work to this end, I would vote to refuse the application; but will such denial produce the desired results?

"The field from which gas is to be taken by the petitioner is in

sirability of uniform federal regulation is abundantly clear. Nevertheless, as the Court of Appeals emphasized, 456 F. 2d, at 335, a *need* for federal regulation

---

northern Pennsylvania and southern New York. Apparently, far more of the gas will come from Pennsylvania than from New York and over the extraction of gas in the state of Pennsylvania, this Commission has practically no control. It is possible for Pennsylvania companies to take all of the gas from this field unless the New York companies remove the gas before the field is exhausted.

"Further, the Public Service Commission has been given no adequate authority to determine how the natural gas resources of this state, to say nothing of the resources of Pennsylvania, shall be developed. We have no powers directly to control the amount of gas that is taken from any field and our indirect powers are so limited that it is doubtful if much could be accomplished. The state of New York receives far more gas from sources located beyond its boundaries than it exports to any adjoining state and the conservation of natural gas resources in the various states cannot be properly brought about except through voluntary action of the states or by the Federal government. Neither one is yet operative and while attention has been given to electric interstate commerce, no effective steps have been taken to conserve or regulate the distribution of natural gas, where it is so urgently needed.

"In view of the lack of authority conferred upon this Commission to conserve natural resources, the question becomes primarily what will be gained to consumers in the state of New York if the petition is denied. It is stated that about 80 or 90 per cent of the gas furnished by the petitioner will be used for industrial purposes and that only from 10 to 20 per cent will go to the general public, the inference being that the saving to the companies purchasing the gas will go to enrich a few stockholders. Let us assume such are the facts. Who will gain if those benefited by the petition are deprived of their profits or advantages by a denial of the petition? This Commission does not control the use that will be made of the gas from the field tapped by the petitioner. There are many other companies tapping the supply and we have no means of determining where, when, or to whom the gas will be sold. If restriction is imposed on the use of it in New York, it may go to Pennsylvania; and if the petitioner is not allowed to supply the areas which it is proposed to serve, the gas will go to other areas and there is no assurance that it

does not establish FPC jurisdiction that Congress has not granted. We turn then to analysis of the statute to determine whether Congress withheld, as LP&L argues, authority from the FPC to apply its curtailment regulations to direct sales.

## IV

In § 1 (b) of the Act, "[t]hree things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S., at 516. Each of these is an independent grant of jurisdiction and, though the Act's application to "sales" is limited to sales of interstate gas for resale, the Act applies to interstate "transportation" regardless of whether the gas transported is ultimately sold retail or wholesale. *FPC* v. *East Ohio Gas Co.,* 338 U. S. 464, 468 (1950).[13]

---

will be used any more beneficially from a public viewpoint than it will be if the petition is granted.

"As stated, I am heartily in favor of the conservation of natural gas as well as other natural resources; but in this specific case, will the granting or the denial of the petition work to the benefit of the people of New York? The benefit to the area to be supplied by the petitioner is definite, it is known, it is sure. But if the petition is denied, who will be benefited? There is no assurance upon this point. The answer is speculative and uncertain. There is nothing to assure us that the denial of the petition would conserve the gas supply. Is it not likely that the benefits would merely be diverted from one group or one locality to another?"

[13] *East Ohio* dealt with the grant of FPC jurisdiction over natural gas companies engaged in interstate transportation or sale. What we said there has relevance to the issue in this case:

"Respondents contend, however, that the word 'transportation'

LP&L argues that the proviso in § 1 (b) creates a complete exemption of direct sales from curtailment regulations.[14] The answer is that the prohibition of

in § 1 (b) must be construed as applying only to companies engaged in the business of transporting gas in interstate commerce for hire or for sales to be followed by resales, whereas East Ohio does neither. The short answer is that the Act's language did not express any such limitation. Despite the unqualified language of § 1 (b) making the Act apply to 'transportation of natural gas in interstate commerce,' respondents ask us to qualify that language by applying it only to businesses which both transport and sell natural gas for resale. They rely on a sentence in the declaration of policy, § 1 (a), referring to 'the business of transporting and selling natural gas.' But their contention that the word 'and' in the policy provision creates an unseverable bond is completely refuted by the clearly disjunctive phrasing of § 1 (b) itself. As we pointed out in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 516, § 1 (b) made the Natural Gas Act applicable to three separate things: '(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transporation or sale.' And throughout the Act 'transportation' and 'sale' are viewed as separate subjects of regulation. They have independent and equally important places in the Act. Thus, to adopt respondents' construction would unduly restrict the Commission's power to carry out one of the major policies of the Act. Moreover, the initial interest of Congress in regulation of transportation facilities was reemphasized in 1942 by passage of an amendment to § 7 (c) of the Act broadening the Commission's powers over the construction or extension of pipe lines. 56 Stat. 83. This amendment followed a report of the Commission to Congress pointing out that without amendment the Act vested the Commission with inadequate power to make 'any serious effort to control the unplanned construction of natural-gas pipe lines with a view to conserving one of the country's valuable but exhaustible energy resources.' We hold that the word 'transportation' like the phrase 'interstate commerce' aptly describes the movements of gas in East Ohio's high-pressure pipe lines." 338 U. S. 464, 468–469 (1950) (footnotes omitted).

[14] It is well established that the proviso was added to the Act merely for clarification and was not intended to deprive FPC of any jurisdiction otherwise granted by § 1 (b). *FPC* v. *Transcontinental*

the proviso of § 1 (b) withheld from FPC only *rate-setting* authority with respect to direct sales. Curtailment regulations are not *rate-setting* regulations but regulations of the "transportation" of natural gas and thus within FPC jurisdiction under the opening sentence of § 1 (b) that "[t]he provisions of this Act shall apply to the transportation of natural gas in interstate commerce.. . . ." The Court of Appeals rejected that construction on the ground that under it the "transportation" jurisdiction would swallow up the proviso's exemption for direct sales. We disagree.

The major impetus for the congressional grant of sales jurisdiction to the FPC was furnished by a Federal Trade Commission study of the pipeline industry in 1935–1936.[15] The study showed that increasing concentration in the industry was producing vast economic power for the pipelines and a serious threat of unreasonably high prices for consumers. This threat was most acute in the case of sales for resale because wholesale distributors and their customers had little economic clout with which to obtain equitable prices from the pipelines. State power to regulate rates charged for interstate service to a customer in another State for resale was also thought, within this Court's decisions, constitutionally to be outside the regulatory power of the

---

*Gas Pipe Line Co.*, 365 U. S. 1 (1961); *FPC* v. *East Ohio Gas Co.*, 338 U. S. 464 (1950). The House report on the bill described this second sentence of § 1 (b) as follows:

"The quoted words are not actually necessary, as the matters specified therein could not be said fairly to be covered by the language affirmatively stating the jurisdiction of the Commission, but similar language was in previous bills, and, rather than invite the contention, however unfounded, that the elimination of the negative language would broaden the scope of the act, the committee has included it in this bill." H. R. Rep. No. 709, 75th Cong., 1st Sess., 3 (1937).

[15] S. Doc. No. 92, pt. 84–A, 70th Cong., 1st Sess., submitted Dec. 31, 1935.

States. *Public Utilities Comm'n* v. *Attleboro Steam & Elec. Co.,* 273 U. S. 83 (1927); *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298 (1924).

In response to this report and pressures from state regulatory agencies, Congress enacted a federal "sales" jurisdiction in the Natural Gas Act, by which Congress granted *rate-setting* authority to the Commission over all interstate sales for resale. But as this Court, in *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23 (1920), had sustained state authority to regulate rates for "direct" sales, and, moreover, the need for federal authority here was not deemed acute, Congress withheld *rate-setting* jurisdiction over direct sales. That rate setting was the only subject matter covered by "sales" jurisdiction and the "direct sales" exception is clear from the legislative history of the proviso. The original phrasing of the proviso was:

> *"Provided,* That nothing in this Act shall be construed to authorize the Commission *to fix rates or charges* for the sale of natural gas distributed locally in low-pressure mains or for the sale of natural gas for industrial use only." Hearing on H. R. 11662 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 1 (1936) (emphasis supplied).

The phrasing was changed and the words "to fix rates or charges" were subsequently deleted, but the House committee report confirms that the proviso as finally phrased was nevertheless meant to be restricted to *rate setting.* H. R. Rep. No. 709, 75th Cong., 1st Sess., 4 (1937), states:

> "It was urged in connection with earlier bills that there should be inserted at the end of this subsection a proviso as follows:
>
> " '*Provided,* That nothing in this Act shall be construed to authorize the Commission to fix the rates

or charges to the public for the sale of natural gas distributed locally.'

"In order to avoid misunderstanding the committee thought it necessary to omit this proviso from the present bill for the following reasons, even though there is entire agreement with the intended policy which would have prompted its inclusion: First, it would have been surplusage if interpreted as it was intended to be interpreted, and, second, it would have been, in all likelihood, a source of confusion if interpreted in any other way. For example, it was felt that in the effort to find a reason for its inclusion it might have been argued that it exempted sales to a publicly owned distributing company, and such an exemption is not, of course, intended. *It is believed that the purposes of this proviso, assuming the need for any such provision, are fully covered in the present provision by the language—'but shall not apply to any other . . . sales of natural gas.'*" (Emphasis supplied.)

The author of the changed version, the General Solicitor of the National Association of Railroad and Utilities Commissioners, confirmed this interpretation. Hearing on H. R. 4008, before the House Committee on Interstate and Foreign Commerce, 75th Cong., 1st Sess., 143.

Thus, Congress' grant of sales jurisdiction as to sales for resale and the prohibition as to direct sales were meant to apply exclusively to *rate setting,* and in no wise limited the broad base of "transportation" jurisdiction granted the FPC. That head of jurisdiction plainly embraces regulation of the quantities of gas that pipelines may transport, for in that respect Congress created "a comprehensive and effective regulatory scheme," *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S., at 520, to "afford consumers a complete, permanent and effective bond of protection . . . ." *At-*

*lantic Refining Co.* v. *Public Service Comm'n,* 360 U. S. 378, 388 (1959).

"Therefore, when we are presented with an attempt by the federal authority to control a problem that is not, by its very nature, one with which state regulatory commissions can be expected to deal, the conclusion is irresistible that Congress desired regulation by federal authority rather than non-regulation." *FPC* v. *Transcontinental Gas Pipe Line Corp.,* 365 U. S., at 28.

Comprehensive and equitable curtailment plans for gas transported in interstate commerce, as already mentioned, are practically beyond the competence of state regulatory agencies. Congress was also aware that *Pennsylvania* v. *West Virginia,* 262 U. S. 553 (1923), casts serious doubt upon the constitutionality of state regulation of such plans. That decision was considered in the deliberations on the Natural Gas Act and was cited to the House Committee as a reason for federal regulation. Hearing on H. R. 11662 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 14 (1936).

Finally, this Court has already stated its view that curtailment plans are aspects of FPC's "transportation" and not its "sales" jurisdiction. In *Panhandle Eastern,* 332 U. S., at 523, we said:

"[T]he matter of interrupting service is one largely related . . . to transportation and thus within the jurisdiction of the Federal Power Commission to control, in accommodation of any conflicting interests among various states." [16]

---

[16] In *Panhandle,* the Court was asked to hold that direct industrial sales customers receiving gas in interstate commerce could not be subjected to state regulatory control consistently with FPC jurisdiction in the area. In support of this position, the customers

## V

Since curtailment programs fall within the FPC's responsibilities under the head of its "transportation" jurisdiction, the Commission must possess broad powers to devise effective means to meet these responsibilities. FPC and other agencies created to protect the public interest must be free, "within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances." *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 586 (1942). Section 16 of the Act assures the FPC the necessary degree of flexibility in providing that:

> "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act. . . ." 15 U. S. C. § 717o.

In applying this section, we have held that "the width of administrative authority must be measured in part by the purposes for which it was conferred . . . . Surely the Commission's broad responsibilities therefore demand a generous construction of its statutory authority." *Permian Basin Area Rate Cases*, 390 U. S. 747, 776 (1968); see *United Gas Pipe Line Co.* v. *FPC*, 385 U. S. 83, 89–90 (1966).

The substantive standard governing FPC evaluation of curtailment plans is found in § 4 (b) of the Act:

> "No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or

---

argued that state control of certain matters affecting the sales could not practically be managed by state regulation. Not surprisingly, the problem of curtailment was used as a prime example of a matter presenting these difficulties.

grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 15 U. S. C. § 717c (b).

Two procedural mechanisms are available to enforce this antidiscriminatory provision of § 4 (b). As to a tariff already on file and in effect, the FPC may proceed under § 5 (a).[17] The § 5 (a) procedure has substantial disadvantages, however, rendering it unsuitable for the evaluation of curtailment plans. The FPC must afford interested parties a full hearing on the reasonableness of the tariff before taking any remedial action, and, as we have observed, "the delay incident to determination in § 5 proceedings through which initial certificated rates [as well as "practices" and "contracts"] are reviewable appears nigh interminable." *Atlantic Refining Co.* v.

---

[17] Section 5 (a) provides:

"Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates." 15 U. S. C. § 717d (a).

*Public Service Comm'n,* 360 U. S., at 389.[18] In addition a prescribed remedial order can have only prospective application. FPC has therefore chosen to process curtailment plans under §§ 4 (c), (d), and (e).[19]

---

[18] Of course, even when conducting a § 5 hearing, the Commission would have emergency authority to issue interim orders effecting a curtailment plan. *FPC* v. *Natural Gas Pipeline Co.,* 315 U. S. 575 (1942).

[19] These sections provide,

"(c) Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from the date this Act takes effect) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

"(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

"(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission, or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and

Under these provisions, a pipeline's tariff amendments filed with the FPC go into effect in 30 days unless suspended by the Commission. If a filing is challenged or the FPC of its own motion deems it appropriate, it may suspend the amended tariff for up to five months, at the end of which time the amended tariff becomes effective pending the completion of hearings. In these hearings, the pipeline has the burden of proving that its plan is reasonable and fair.

Order No. 431 makes full use of the § 4 procedures. All pipelines facing shortages necessitating curtailment are required to file reasonable allocation schemes as amendments to their existing tariffs, or to state that the existing tariffs are adequate. When emergency or other conditions arise and it appears desirable in the public interest to place a plan into effect, the FPC may accept the filing, implement it immediately or suspend it, and employ the plan as a working guideline while hearings continue. In addition to the flexibility of this arrangement, the requirement that pipelines submit plans enables the FPC to utilize each pipeline's unique knowledge of its customers' needs, ability to substitute other fuel sources, and other relevant considerations.

The Court of Appeals held that, under our decision in *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S., at 17, FPC authority over direct-sales contracts is limited to a "veto power" to be exercised only in certification proceedings under § 7 (c) and abandonment

---

the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect." 15 U. S. C. §§ 717c (c), (d), and (e).

proceedings under § 7 (b). We reject this argument on two grounds. First, *Transcontinental* dealt with FPC's authority to consider direct-sales *rates* in certification proceedings. We there noted that under § 1 (b) FPC jurisdiction *over rates* was limited. The litigation here, unlike *Transcontinental*, does not involve rates and therefore the provision of § 1 (b) is wholly inapplicable. Secondly, *Transcontinental* dealt only with FPC "veto power" under § 7, and in no way limited FPC authority under § 4 (b) to prevent discrimination among a pipeline's customers. Since § 4 (b) deals with "service," the FPC may invoke it to deal with curtailment programs, whether or not it could also invoke § 7 for that purpose.

*Amici* have argued that permitting the pipeline's tariff amendments to take effect despite contrary terms in existing contracts is inconsistent with our decision in *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332 (1956). In that case, however, we dealt with an attempt by a pipeline *unilaterally* to effect a change in its contract terms by making a filing under § 4. In the present cause, the issue is whether the FPC, acting under the head of its transportation jurisdiction and its broad mandate under § 16, may order pipelines facing shortages to develop and submit rational curtailment arrangements. Our holding in *Mobile Gas Service Corp.* does not govern the decision of this issue since, as we observed in that case:

> "[D]enying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest." 350 U. S., at 344.

We conclude therefore that the FPC has the jurisdiction asserted here and that the Natural Gas Act fully authorizes the method chosen by the FPC for its exercise.

## VI

In addition to holding that the proviso to § 1 (b) prohibited curtailment of gas delivered to the Nine-Mile Point Station, the Court of Appeals held that those deliveries were not regulable by the FPC because "the flow of gas from the Black system into the Green system . . . is occasional and irregular, as well as minimal," and that "[t]he Green system, as an entire and separate unit, is physically located and functions entirely in Louisiana"; the court concluded that, for these reasons, "[t]he regulation of the Green system is substantially and essentially a localized matter committed to Louisiana's jurisdiction." 456 F. 2d, at 339–340. The Court of Appeals erred in deciding this question. The FPC had exercised its primary jurisdiction and was conducting proceedings to determine whether the Green System was subject to its jurisdiction. In that circumstance, the District Court and the Court of Appeals were obliged to defer to the FPC for the initial determination of its jurisdiction. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41 (1938). The need to protect the primary authority of an agency to determine its own jurisdiction "is obviously greatest when the precise issue brought before a court is in the process of litigation through procedures originating in the [agency]. While the [agency's] decision is not the last word, it must assuredly be the first." *Marine Engineers Beneficial Assn.* v. *Interlake S. S. Co.*, 370 U. S. 173, 185 (1962). Review of the FPC decision may proceed in due course pursuant to § 19 (b) of the Act, 15 U. S. C. § 717r (b). We see no need to make the same disposition as to the

curtailment question since the Court of Appeals had Op. No. 606 before it and acted upon the opinion in reaching its decision.

*Reversed.*

MR. JUSTICE STEWART took no part in the decision of these cases.

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.