**PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Tennessee Gas Pipeline Company, Ozark Gas Transmissions System, Intervenors.**

**OZARK GAS TRANSMISSION SYSTEM, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Public Service Commission of the State of New York, Intervenor.**

**Nos. 87–1706, 88–1007.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1988.
Decided Jan. 27, 1989.

David D'Alessandro, with whom Richard A. Salomon, was on the brief, for Public Service Com'n of the State of N.Y., petitioners in No. 87-1706 and intervenor in No. 88-1007.

Karol Lynn Newman, Washington, D.C., for Ozark Gas Transmission System, petitioner in No. 88-1007 and intervenor in No. 87-1706. John T. Stough, Jr. and Joseph E. Stubbs, Washington, D.C., also entered appearances for Ozark Gas Transmission Systems.

Frank R. Lindh, Attorney, F.E.R.C., Washington, D.C., with whom Catherine C. Cook, Gen. Counsel and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent in Nos. 87-1706 and 88-1007. John H. Conway, Atty., F.E.R.C., also entered an appearance for respondent.

Robert H. Benna, David D. Withnell, Terence J. Collins, Washington, D.C., and Margaret L. Bollinger entered appearances for intervenor Tennessee Gas Pipeline Co., in No. 87-1706.

Before EDWARDS and WILLIAMS, Circuit Judges, and JOHN W. REYNOLDS [*], Senior District Judge.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* (1982), sets up a carefully balanced mechanism for the Federal Energy Regulatory Commission's supervision of natural gas company rates. Under § 4, 15 U.S.C. § 717c, a company may file rate changes, but these are subject to Commission review to determine whether they are "just and reasonable." Under § 5, 15 U.S.C. § 717d, the Commission may take the initiative and determine that rates already filed are not just and reasonable and may issue an order changing them.

The two modes of Commission review entail quite different procedures. Under § 4 the company has the burden of showing that the proposed rates are just and reasonable, while under § 5 the Commission must show that the rates it would alter are not just and reasonable, and that the ones it seeks to impose are. The unifying principle is that the proponent of change bears the burden. Under § 4, moreover, the Commission may suspend the rates for up to five months while deciding the issue; even after the end of any suspension period, if the company has filed increased rates, the Commission may order them collected under bond and may order refunds if it ultimately rejects the company's proposed rates. Under § 5 there is no provision for refund of rates collected while the Commission hears the matter.

On four occasions in the last three years this court has reviewed Commission efforts to compromise § 5's limits on its power to

---

[*] Of the United States District Court for the Eastern District of Wisconsin, sitting by designation pursuant to 28 U.S.C. § 294(d).

revise rates. On each the court has repelled the Commission's gambit. This is number five.

## I.

Ozark Gas Transmission System is a partnership that transports natural gas for its partners through an interstate pipeline in southeastern Oklahoma and northeastern Arkansas. It neither purchases nor resells gas. In July 1981 FERC issued a certificate of public convenience and necessity to Ozark, pursuant to § 7 of the Act, 15 U.S.C. § 717f. It approved a demand rate that would recover Ozark's operating and maintenance expenses, certain taxes, and amortization and interest on its debt. But as Ozark's rate base was expected to decline through depreciation, there was concern that a fixed commodity rate would lead to an unreasonable return on equity. Accordingly FERC rejected permanent rates for Ozark. Instead it established interim rates, with the requirement that Ozark file a rate case under § 4 within two years of the start of service. *Ozark Gas Transmission System,* Opinion No. 125, 16 F.E.R.C. ¶ 61,099 at 61,198–99 (1981).[1] This court affirmed. *Public Service Commission of New York v. FERC,* 680 F.2d 252 (D.C.Cir.1982) (*per curiam*).

On March 1, 1984 Ozark filed under § 4, proposing to retain its original rates. The Commission staff objected that Ozark should be compelled to refile its rates under § 4 every three years, giving the Commission an opportunity for periodic rate review under § 4's favorable procedural provisions. Public Service Commission of New York ("PSCNY") agreed with the staff, but sought an additional protection. Rather than using the book value of the relevant assets at the *start* of the relevant period, PSCNY sought to require Ozark to use an "average" rate base, i.e., a value reflecting the expected decline of the rate base through depreciation over the period the rates were to be in effect.

The administrative law judge approved Ozark's rates and, on the ground that FERC did not have the authority to side-

step the strictures of §§ 4 and 5, refused to follow the staff's refiling recommendation. *Ozark Gas Transmission System* (Initial Decision), 32 F.E.R.C. ¶ 63,019 (1985). The opinion noted, however, that concerns regarding the declining rate base were "legitimate and worthy of full consideration." *Id.* at 65,053. The ALJ suggested that in their exceptions to the initial decision the parties might consider, as a device for addressing the declining rate base, a "cost-of-service" commodity rate, i.e., one under which a pipeline recovers its actual costs plus an allowed return. *Id.*

The Commission set aside the ALJ's disposition, and approved Ozark's proposed rates, subject to a requirement that Ozark file rates under § 4 every three years. *Ozark Gas Transmission System,* Opinion No. 273, 39 F.E.R.C. ¶ 61,142 (1987). FERC held that its authority under § 5 provided "insufficient protection by itself, to protect consumers from the payment of excessive rates for periods prior to the completion of a section 5 proceeding," *id.* at 61,512, and concluded that "good cause" existed to require periodic § 4 refilings, *id.* It also rejected PSCNY's proposal that Ozark be required to use an average rate base.

On rehearing, the Commission referred to statutory provisions that, in its view, justified the refiling requirement: §§ 10, 14 and 16 of the Act, 15 U.S.C. §§ 717i, 717m, 717*o*. *Ozark Gas Transmission System,* Opinion No. 273–A, 41 F.E.R.C. ¶ 61,207 at 61,566 (1987). § 16 gives the Commission power to perform "acts ... necessary or appropriate to carry out the provisions" of the Act, and also to specify forms to be filed, together with the information they must contain and their due dates. The other two sections invoked— which respectively give the Commission authority to require the filing of periodic reports on specified subjects and to investigate potential statutory violations—are now only marginally relevant, as the Commission here abandons any claim that either of them independently authorizes its

---

1. The validity of this condition is not involved    in the present dispute.

action in this case and asserts only that they "underscore[ ]" its authority under § 16. See Respondent's Brief at 29 n. 13.

Ozark petitions for review on the ground that FERC's § 4 refiling requirement cannot stand. We agree. PSCNY petitions on the ground that the Commission was arbitrary and capricious in rejecting its average rate base proposal. As that aspect of the Commission's decision was plainly based on its view that the refiling requirement was an adequate solution, we remand the case for the Commission to assess the problem and consider appropriate and lawful solutions.

## II.

■ Section 16 is a broad grant of authority ancillary to FERC's basic powers under the Natural Gas Act. It provides in pertinent part:

> The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the informaton which they shall contain, and the time within which they shall be filed....

15 U.S.C. § 717o (1982). One can certainly imagine instances where such a general grant of power could encompass the power to require regulated entities to file applications provided for under another, distinct provision of the enabling act. Here, however, the effect of such a reading of § 16 would be to demolish the balance that the Act establishes in §§ 4 and 5.

Our consideration of efforts by the Commission to escape the inconveniences of § 5 goes back at least to *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C.Cir.1979), *cert. denied*, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). There the Commission issued a certificate of con-

venience and necessity for new transportation service under § 7 of the Act, 15 U.S.C. § 717f. It conditioned the certificate on the pipeline's crediting portions of the new revenue to customers of other service and asserted that without such a condition the pipeline would receive windfall revenues because of the interaction of the new service with previously approved service. See 613 F.2d at 1125. The Commission relied on § 7(e)'s grant of a general power to attach to a certificate "such reasonable terms and conditions as the public convenience and necessity may require."

In response, the court identified the condition as a de facto reduction in existing rates. While broad language such as that of § 7 might justify such a condition in some contexts, the court concluded that, in light of the distinctions between §§ 4 and 5, FERC's proposed tinkering with existing rates would "effectively emasculate the role of section 5 in the ratemaking scheme." 613 F.2d at 1129. "Section 5 would be reduced to a stopgap device, necessary for reducing unjust or unreasonable rates only when no new certificate filings were being made." *Id.* The Commission's proposed use of § 16 here would in some respects crush § 5 even more completely, for the Commission could reduce rates outside § 5 even when a natural gas company had no occasion to make filings under § 7. The court stressed the procedural distinctions between §§ 5 and 7, the latter not even requiring a hearing or findings. *Id.* at 1129–30. Here, too, although the Commission must hold hearings on objections to § 4 filings, the order has serious procedural consequences: FERC's attempted relocation of the expected dispute from § 5 to § 4 would shift the burden of proof from the Commission to the company.

The *Panhandle* court also referred to distinctions in timing. It saw the relation between §§ 4 and 5 as assuring adequate rate stability and cost recovery for natural gas companies, and thereby advancing the public interest in receiving high quality service. *Id.* The Commission's proposed use of § 7 would have jeopardized both by allowing it to force sudden rate reductions.

This argument appears less apt here, as § 4's provisions for bonding and refunds are triggered by filings of proposed rate *increases*, which no one anticipates.

As to the risk that the pipeline would otherwise receive a windfall, the court held flatly that that possibility did not justify eroding the line between §§ 4 and 5. It pointed to other devices by which the Commission could handle the problem. *Id.* at 1133.

Since *Panhandle*, this court has continued to insist that FERC observe the distinctions between §§ 4 and 5. In *Northern Natural Gas Co. v. FERC*, 827 F.2d 779 (D.C.Cir.1987) (*en banc*), FERC sought to persuade the court to abandon the *Panhandle* doctrine itself, but the court refused. In *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 183 (D.C.Cir.1986), the Commission seized the occasion of a § 4 filing to question the pipeline's treatment of a set of rates not directly affected by the filing, and placed on the pipeline the burden of establishing that the treatment was just and reasonable. The court held that as the action did not fit into the "narrow section 4 range of acceptance or disapproval of a pipeline's proposed changes," *id.* at 187, the burden was on the Commission to show the treatment unjust or unreasonable. "The Commission is not free to blend, or pick and choose at will between, its section 4 and 5 authority; FERC must use the appropriate authorization in the appropriate way in order to remain with the bounds Congress has set for the agency." *Id.* at 183. Similarly, in *ANR Pipeline Co. v. FERC*, 771 F.2d 507 (D.C.Cir. 1985), the court insisted that whenever FERC wished to force *"an alteration in an unchanged part of a proposed higher rate,"* it must meet the burden appropriate to the proponent of a rate change. *Id.* at 514 (emphasis in original).

Most recently, in *Tennessee Gas Pipeline Company v. FERC*, 860 F.2d 446 (D.C. Cir.1988), the court addressed FERC's disposition of a pipeline's proposal to simultaneously (1) extend interruptible transportation service to a specific class of previously ineligible customers and (2) provide a special rate for such customers. *Id.* at 449–50. The Commission split the proposal, accepting the first part and rejecting the second, thereby effectively imposing on the pipeline an obligation to provide a new type of service at a rate the pipeline had never proposed. *Id.* at 453. We held that although the Commission could do so by exercising its § 5 powers, i.e., by shouldering the burden of proof that the existing rate was unjust or unreasonable and that the proposed new rate was just and reasonable, it could not thrust the burden on the pipeline just because of its § 4 filing. *Id.* at 453–56. Thus the court has consistently disallowed attempts to blur the line between §§ 4 and 5.

■ Of course where a § 4 proceeding is under way, the Commission may discover facts that persuade it that reductions or changes are appropriate that require the exercise of its § 5 powers. The above cases make clear that the Commission is free to act on those discoveries, so long as it shoulders the § 5 burdens. See *Sea Robin*, 795 F.2d at 183–84; *Tennessee Gas Pipeline Co.*, at 455–56. Here the Commission made clear that its purpose in requiring § 4 filings was precisely to avoid the "insufficient protection" afforded by § 5, see *Ozark Gas Transmission System*, 39 F.E.R.C. ¶ 61,142 at 61,512, i.e., to avoid its procedural constraints.

Our prior cases treating § 16 also tend to refute any notion that it might possess some exceptional power to trump those sections. In *Mobil Oil Corp. v. FPC*, 483 F.2d 1238 (D.C.Cir.1973), we rejected the Commission's claim that § 16 functioned as a sort of statutory equivalent of the Constitution's "necessary and proper" clause, entitling the Commission to employ laxer procedures than would otherwise be required. We said:

The substantive provisions of the Act contemplate certain procedures, as incident to the functions provided. The range of permissible procedures must be derived from these sections, sections like sections 4 and 5 of the Natural Gas Act, and the functions they describe. Section 16, which uses a broad generality of

"necessary or appropriate" that is not rooted in a function, cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined.

483 F.2d at 1257.[2] In a later case, *Northern Natural Gas Co. v. FERC*, 785 F.2d 338, 341 (D.C.Cir.1986), we upheld the Commission's use of § 16 to support its retroactively authorizing pipelines to abandon service. But the court made clear that the Commission's auxiliary power under § 16 was limited to cases where " 'the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.' " *Id.* at 341 (citations omitted).

FERC defends its move by seeking to draw an analogy between this case and its provisions governing pipeline use of purchased gas adjustment clauses. See 18 C.F.R. §§ 154.301–.310 (1988). FERC's PGA regulations allow pipelines to adjust their rates quarterly to reflect changes in their gas costs, but condition this relief on their filing new tariffs under § 4 every three years. See *id.* at § 154.303(e). This use of § 4 obviously rests on pipeline consent, which is absent here.

Similarly, we are not persuaded by FERC's references to the Supreme Court's approval of FERC's emergency gas curtailment scheme in *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). There the Commission required pipelines to file emergency curtailment programs under § 4 as partial remedies for the then-developing natural gas shortages. The briefs disclose that no party claimed that the system impinged on the proper balance between §§ 4 and 5, so the Court never addressed it directly and only peripherally alluded to the propriety of the Commission's using § 4. See 406 U.S. at 642–45, 92 S.Ct. at 1839–41. In any event, its acceptance of the use of § 4 appeared to rest on its perception of a suddenly-arriving crisis for the gas industry and its ulti-

mate customers. The Court referred to "a pattern of temporary and chronic natural gas shortages," *id.* at 626, 92 S.Ct. at 1831, and observed that proven reserves in the continental United States had fallen by 10.3% between 1967–70 and that about 95% of these reserves were already committed through preexisting contracts, *id.* at 626 n. 2, 92 S.Ct. at 1831 n. 2. Thus the need for curtailment plans was apparently not foreseen at the time of the Commission's initial rate approvals. Here, on the other hand, Ozark's declining rate base problem was well-known in advance of the initial rate approval and nothing suggests that adequate alternative solutions are unavailable.

Moreover, as the above discussion of our cases indicates, this court has not viewed *Louisiana Power & Light* as allowing FERC to circumvent §§ 4 and 5 whenever it deems that desirable. We have continued to require the agency to adhere to the basic framework of the Act, despite resulting inconvenience. This has been true even with regard to the curtailment plans. As we held in *City of Willcox v. FPC*, 567 F.2d 394, 402–03 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978), although the Commission can require § 4 filings for initial curtailment plans, once such a plan is in effect it must use the mechanism of § 5 to impose amendments.

We see no basis for reading § 16 as overriding the balance achieved by §§ 4 and 5, and find FERC's expansive view of its § 16 powers to be contrary to the purposes of the Act. Whatever the scope of any *Louisiana Power & Light* exception to the scheme of §§ 4 and 5, it does not extend to the nonexigent situation before us today.

### III.

■ FERC grounded its periodic refiling requirement on a finding that Ozark's rate base would decline rapidly over the next

---

**2.** Our decision in *Mobil* presupposed that courts might require agencies in rulemakings under 5 U.S.C. § 553 (1982) to impose more onerous procedures. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), undermined this premise.

few years. Ozark challenges this assessment, claiming that it was not based on substantial evidence on the record.

Ozark's preservation of this argument in its application for rehearing before the Commission was marginal. § 19 of the Natural Gas Act, 15 U.S.C. § 717r (1982), establishes as a precondition to judicial review of a Commission order that the objecting party must have applied for rehearing, setting forth "specifically the ground or grounds upon which such application is based." On this issue Ozark asserted only, "[F]inally, we would point out that there is no substantial evidence to support imposing the condition [periodic rate refiling], even if authority to do so did exist." Ozark Petition for Rehearing, Joint Appendix ("J.A.") at 285. As we shall see, however, Ozark's objection here is scarcely more specific than that, so we accept it as raising the vague objection that Ozark now presses.

PSCNY presented estimates suggesting the probability that Ozark's rate base would fall speedily, as no major additions to plant were expected to offset depreciation. Ozark's only attack is that such estimates are "theoretical," see Ozark Brief at 21, and that PSCNY's study failed to account for plant additions by Ozark. *Id.* But estimates are by their very nature theoretical; the question is whether they are plausible. Ozark has suggested no reason to believe they cannot withstand scrutiny under the substantial evidence test.

When Ozark complained before the ALJ that PSCNY's initial estimates neglected to consider likely plant additions by Ozark, PSCNY recalculated its figures, using Ozark's own estimates of its then-planned new investment.[3] See PSCNY Initial Brief at 14, J.A. at 114. This new measure still showed a declining rate base and (holding other things constant) a sharply rising return on equity. See *id.*, Table B, Exhibit 25 Revised, J.A. at 116.

---

3. PSCNY took the $2.5 million estimate given by Ozark's expert witness in testimony before the ALJ, see Transcript of Hearing, December 11, 1984 at J.A. 4–5 (testimony of Mr. Allen), as-

The burden of proof in a § 4 filing is on the applicant. See 15 U.S.C. § 717c(e). Yet Ozark has failed to explain why the logically anticipated effects of depreciation and tax deferment will not cause a steady net erosion of its rate base. Consequently, we find that FERC's acceptance of PSCNY's projection of a rate base decrease was reasonable and was supported by the record.

\* \* \*

As we have rejected Ozark's attack on FERC's original ground for concern, but have accepted its attack on FERC's remedy, we remand the case to FERC for such further proceedings as may be appropriate.

SO ORDERED.

sumed that this investment would be made in accordance with Ozark's existing financing structure—namely, 70% debt and 30% equity—and extrapolated this figure in its data.