CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Public Service Electric and Gas Company,
Long Island Lighting Company, Phila-
delphia Gas Works, Bay State Gas Com-
pany, et al., Brooklyn Union Gas Compa-
ny, General Motors Corporation, Texas
Eastern Transmission Corporation, Con-
solidated Gas Supply Corporation, Pub-
lic Service Commission of the State of
New York, Intervenors.

No. 81–1082.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 4, 1981.

Decided April 20, 1982.

As Amended April 20, 1982.

William I. Harkaway, Chicago, Ill., for petitioner.

Auburn L. Mitchell, Atty., Federal Energy Regulatory Com'n, Washington, D. C., with whom Jerome Nelson, Acting Gen. Counsel and Sol., Federal Energy Regulatory Com'n, Washington, D. C., was on the brief, for respondent.

Platt W. Davis, III, Washington, D. C., with whom David T. Andril, Washington, D. C., was on the brief for intervenor, Texas Eastern Transmission Corp. J. Evans Attwell, Houston, Tex., also entered an appearance for intervenor, Texas Eastern Transmission Corp.

James R. Lacy, Newark, N. J., was on the brief for intervenor, Public Service Elec. and Gas Co.

Joseph R. Davidson, Wayne, Pa., was on the brief for intervenor, Philadelphia Gas Works.

John S. Schmid, Washington, D. C., was on the brief for intervenor, Bay State Gas Co., et al.

Joseph P. Stevens and Alvin Adelman, Brooklyn, N. Y., were on the brief for intervenor, Brooklyn Union Gas Co.

Edward J. Grenier, Jr., Richard P. Noland, William H. Penniman, Washington, D. C., and Julius Jay Hollis, Detroit, Mich., were on the brief for intervenor General Motors Corp.

Karen Lyn Newman, Washington, D. C., was on the brief for intervenor, Consolidated Gas Supply Corp.

Richard A. Solomon and Alexander M. Peters, Washington, D. C., were on the brief for intervenor, Public Service Commission of the State of N. Y.

Before ROBINSON, Chief Judge, and WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner, Consolidated Edison ("Con Ed") challenges the Federal Energy Regulatory Commission's ("FERC" or "Commission") approval of an end use curtailment plan for natural gas that does not require customers who undergo below average curtailment to compensate those who are curtailed more than the average customer.[1]

---

1. Opinion No. 92, Proposal by the Federal Energy Regulatory Commission Relating to the Incorporation of Compensation Provisions in Curtailment Plans, FERC Docket Nos. RM 78–4, RP 71–130, RP 72–58, RP 75–111 & RP 72–89

(Aug. 4, 1980), Joint Appendix ("J.A.") 73, *rehearing denied*, Order Pertaining to Compensation, Denying Rehearing (Dec. 8, 1980); J.A. 222. In Opinion No. 92, the Commission suspended rulemaking on the compensation issue

Con Ed argues that FERC's action constitutes a taking of property without just compensation, and is thus in violation of the fifth amendment. It also argues that FERC's rejection of a compensation scheme was not a product of reasoned decisionmaking and was arbitrary and capricious. For the reasons set forth below, we affirm the Commission.

## I. BACKGROUND

### A. *History of Curtailment Plans*

Following natural gas shortages on a number of pipelines in 1970, the Commission[2] issued Order No. 431, 45 F.P.C. 570 (1971), directing each interstate pipeline company to report to the Commission stating whether it expected to experience natural gas shortages. Those companies that anticipated shortages were required to submit a revised tariff outlining their plans for allocating short supplies. Pipeline companies filed two types of curtailment plans: "pro-rata" plans and "end use" plans. Under a pro-rata plan, all customers would receive the same proportion of the natural gas they contracted for. The worse the shortage, the smaller that proportion would be; but no customer would receive a greater percentage of his contract than any other customer. In contrast, an end use plan would allocate gas according to the use to which that gas would ultimately be put. Under an end use plan, the contracts providing gas to the highest priority end users must be performed before any gas is allocated to the next highest user.[3]

Two years after it first solicited curtailment plans, the Commission issued a policy statement stating its preference for end use

curtailment plans. Order No. 467, 49 F.P.C. 85 (1973). As modified by a subsequent order,[4] this policy statement established nine priority rankings for end users. These rankings are:

(1) Residential, small commercial (less than 50 Mcf on a peak day).

(2) Large commercial requirements (50 Mcf or more on a peak day), firm industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements.

(3) All industrial requirements not specified in (2), (4), (5), (6), (7), (8), or (9).

(4) Firm industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.

(5) Firm industrial requirements for large volume (3,000 Mcf or more per day) boiler fuel use where alternate fuel capabilities can meet such requirements.

(6) Interruptible requirements of more than 300 Mcf per day, but less than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.

(7) Interruptible requirements of intermediate volumes (from 1,500 Mcf per day through 3,000 Mcf per day), where alternate fuel capabilities can meet such requirements.

(8) Interruptible requirements of more than 3,000 Mcf per day, but less than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.

(9) Interruptible requirements of more than 10,000 Mcf per day where alternate fuel capabilities can meet such requirements.

in FERC Docket No. RM 78–4, choosing instead to address the propriety of compensation in the specific contexts of curtailment plans submitted by the Texas Eastern Transmission Corporation ("Texas Eastern") and the Columbia Gas Transmission Corporation. Since Con Ed only appeals the Commission's decision with regard to Texas Eastern, we restrict our discussion to that aspect of Opinion No. 92.

2. Pursuant to the Department of Energy Organization Act, Pub.L.No. 95–91, 91 Stat. 565 (1977) (codified at 42 U.S.C. § 7101 *et seq.*), the Federal Power Commission's ("FPC") au-

thority to implement curtailment plans was transferred to FERC. This opinion refers to both the FPC and FERC as "the Commission."

3. *See North Carolina v. FERC*, 584 F.2d 1003, 1007 (D.C.Cir.1978).

4. Order 467–B, 49 F.P.C. 583 (1973). The Commission also clarified its policy with regard to emergency and extraordinary relief in Order 467–A, 49 F.P.C. 217 (1973) and Order 467–C, 51 F.P.C. 1199 (1974), respectively.

The Commission explained its priority scheme both on efficiency grounds and on an assessment of the comparative hardship suffered by different end users should they be required to reduce their consumption of natural gas. Generally, the Commission found an end use scheme preferable to a pro-rata scheme "because contracts do not necessarily serve the public interest requirement of efficient allocation of this wasting resource." 49 F.P.C. at 86. By employing an end use plan, natural gas could be directed to those who could burn it most efficiently or for whom it would be most expensive to convert to other fuels. Turning to its own priority scheme, the Commission reasoned that it is least efficient to allocate gas to interruptible customers because "[i]nterruptible service . . . envisions interruption. And accordingly, interruptible customers can most reasonably be expected to have alternate fuel facilities already operational." 49 F.P.C. at 86 (*quoting Arkansas-Louisiana Gas Co.*, 49 F.P.C. 53, 66 (1973)). The Commission also labelled those in the next lowest priority group—boiler fuel users—as "inferior" users of natural gas for the following reasons:

> Aside from the established physical fact that combustion of natural gas for raising steam in boilers and its subsequent conversion into electricity or mechanical energy results in a loss of roughly two-thirds of the heating value of the gas used—which we regard as unacceptably inefficient in time of shortage—we note also that those who use gas as boiler fuel generally can substitute other fuels more readily and at lower overall cost than other gas users; additionally, pollution control is more practical because of the large size of individual installations. Other fuels generally can be phsyically [sic] substituted in large boiler fuel applications with less inconvenience and less

possible adverse consequences than in other industrial applications, such as direct fired uses, and other uses demanding precise temperature control, flame characteristics, instantaneous response and atmosphere quality.

*Id.* In addition to these efficiency concerns, the Commission found that its priority scheme would best protect "residential and small volume consumers who cannot be safely curtailed on a daily basis." *See* 49 F.P.C. at 86.[5]

End use plans were not without their critics. In a petition to this court, pipeline customers receiving below average percentages of their contracts argued that end use plans illegally reallocated natural gas among pipeline customers and were thus in violation of section 7(a) of the Natural Gas Act, 15 U.S.C. § 717f(a). We rejected this argument, ruling that section 7(a) only prohibits the Commission from ordering sales to new customers when to do so would impair service to existing customers. Since curtailment plans govern pipeline sales during *retractions* of service, rather than *expansions* of service, we held that section 7(a) is inapplicable to curtailment plans. *See American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 936 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). Subsequently, in *North Carolina v. FERC*, 584 F.2d 1003, 1011 (D.C.Cir. 1978), we discussed at greater length the scope of the Commission's curtailment authority, explaining that discriminatory treatment of distributors is only justified to the extent that a curtailment plan reasonably reflects the *actual* impact that plan will have on ultimate consumers. Thus, we suggested that an end use plan based on a fixed-base period must be justified in terms of its current effects on preferred end users.[6]

---

**5.** Temporary curtailments of residential users are considered unsafe because of the danger that low gas pressure will extinguish pilot lights, thereby allowing gas to seep out into homes and create a danger of explosion. *See* M. Willrich, Administration of Energy Shortages 31–32 (1976). Temporary curtailments are also dangerous to public health and safety because it is not feasible for residential users to switch temporarily to other fuels and so they must endure cold homes during periods of curtailment. *See* Opinion No. 92 at 4, J.A. 76.

**6.** The Commission takes the position that *North Carolina* does not control curtailment plans formulated under the Natural Gas Policy

One issue that arose repeatedly in prior proceedings is whether an end use curtailment plan should be accompanied by a compensation scheme. Overcurtailed customers argued that it was unfair to require them to shoulder the full cost of purchasing supplemental fuel supplies while other customers continued to receive the natural gas they needed at low regulated prices. They suggested that even if an end use plan is necessary to *allocate* gas to those who could not readily convert to alternative fuels, all customers should share in the costs incurred by overcurtailed customers when they purchased supplemental supplies. As Judge Leventhal explained in *Elizabethtown Gas Co. v. FERC,* 575 F.2d 885 (D.C.Cir.1978)

Act of 1978, Pub.L.No. 95–621, 92 Stat. 3350 ("NGPA"). *See* J.A. 156. The end use plan at issue in this case has already survived judicial review, however, *see Elizabethtown Gas Co. v. FERC,* 636 F.2d 1328, 1333 n.3 (D.C.Cir.1980) (*Elizabethtown II*), and (aside from the compensation issue) is not challenged in this petition. Therefore, we need not consider the validity of this view.

7. In these earlier proceedings, the Commission took the position that compensation payments are "rates" and that requiring only some pipeline customers to pay such "rates" would be discriminatory. The fifth circuit rejected this view in *Mississippi Pub. Serv. Comm'n. v. FPC,* 522 F.2d 1345, 1350 (5th Cir. 1975), *cert. denied,* 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976). The fifth circuit suggested that rather than being ordinary rates, compensation payments are surcharges "imposed in the context of a curtailment plan to insure that the burdens of curtailment are spread evenly and equitably among those affected by such plans. . . . [C]ompensation payments are more analogous to the penalty payments included by the Commission in various curtailment plans to deal with the problem of overtakes." *Id.* (footnote omitted).

This circuit has not sought to classify compensation payments as either "rates" or "surcharges." *See Transcontinental Gas Pipe Line Corp. v. FPC,* 562 F.2d 664, 668 n.5 (D.C.Cir. 1976), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978) (" 'Surcharges' and 'penalty payments' . . . suggest limited application of a pricing mechanism for a short duration to achieve a clearly defined purpose; higher prices for gas sold as emergency relief or improperly taken in excess of curtailment, may not necessarily be analogous to varying permanent prices for gas allocated by the curtailment plan itself."). Instead, this circuit has characterized the Commission's authority to order

(*"Elizabethtown I"*) a compensation scheme would "[balance] the benefit accorded a high-priority purchaser with a charge that offsets, at least in part, the added expense imposed by a curtailment plan upon a lower-priority purchaser." *Id.* at 888–89.

The Commission originally opposed compensation plans on the ground that it lacked jurisdiction to order such payments.[7] We disagreed, and in *Elizabethtown I* and *North Carolina* remanded curtailment plans to the Commission for further consideration of the propriety of a compensation scheme.[8] We now face squarely for the first time the question whether the Commission's *policy* justifications for refusing to order compensation are adequate.[9]

compensation as within its "latitude to make 'pragmatic adjustments which may be called for by particular circumstances.' " *See Elizabethtown Gas Co. v. FERC,* 575 F.2d 885, 888 (D.C.Cir.1978) (*"Elizabethtown I"*).

8. *North Carolina v. FERC,* 584 F.2d 1003, 1016–17 (D.C.Cir.1978); *Elizabethtown I* at 888–89. *Accord Mississippi Pub. Serv. Comm'n. v. FPC,* 522 F.2d at 1350.

9. We touched on this question briefly in *City of Willcox v. FPC,* 567 F.2d 394 (D.C.Cir.1977). In *Willcox,* we bypassed the jurisdictional question by finding that a compensation plan would not be appropriate under the facts of that case. In particular, we noted that no specific compensation scheme had been presented to the Commission for its consideration. In dicta, we also stated that compensation payments "would be inconsistent with the entire purpose behind [end use curtailment]." 567 F.2d at 420.

*Willcox's* dicta does not withstand closer scrutiny. Indeed, there is nothing inherently inconsistent about allocating natural gas to those who are most in need of it while requiring the beneficiaries of such a plan to compensate those who must purchase more expensive alternative supplies. *Cf.* 15 U.S.C. § 3363(g) (requiring compensation, measured by replacement fuel costs, when gas is reallocated under the President's emergency powers). Our conclusion that compensation would not be inconsistent with end use curtailment, however, does not mean that the Commission must require compensation payments. As we explain, *infra,* the absence of compensation payments does not by itself render an end use curtailment plan unduly preferential or discriminatory. Thus, so long as the Commission has not arbitrarily rejected the compensation schemes proposed here, we must uphold its approval of Texas Eastern's curtailment plan.

## B. *Proceedings Before the Commission*

The curtailment plan at issue in this case has been working its way through administrative and judicial proceedings since 1973. On May 31, 1973, Texas Eastern Transmission Company ("Texas Eastern") submitted its permanent curtailment plan [10] to the Commission. Following suspension, the plan went into effect on September 5, 1973. The Commission proceeded to hold hearings on the plan, after which Texas Eastern and most of its customers agreed to a settlement providing that natural gas supplies would be curtailed on the basis of end use. Con Ed and other customers objected to this settlement on various grounds, including the absence of a compensation scheme. On appeal, the Commission issued Opinions Nos. 787, 787–A & 787–B approving the settlement plan on an interim basis, but remanding for further proceedings on several issues, including the desirability of a compensation scheme. In *Elizabethtown Gas Co. v. FERC*, 636 F.2d 1328 (D.C.Cir. 1980) (*"Elizabethtown II"*), this court affirmed FERC's decision to approve Texas Eastern's curtailment plan on an interim basis.

In the proceedings before the Administrative Law Judge ("ALJ") on remand, two of Texas Eastern's customers submitted compensation plans. Elizabethtown Gas Co. suggested that customers should be compensated for the excess cost they incurred in purchasing supplemental gas supplies (*e.g.*, intrastate gas or synthetic gas).[11] This plan would not, however, compensate pipeline customers for lost customers or the cost of other alternative fuels, such as oil. Under the Con Ed plan, compensation would be calculated on the assumption that

pipeline customers switched to oil. Like Elizabethtown's plan, the Con Ed plan sought to distribute the economic burden of curtailment across all pipeline customers, regardless of their priority status.[12]

The ALJ rejected both these plans and the Commission affirmed. The Commission began its analysis by distinguishing between two types of compensation claimants—low priority end users making direct purchases from Texas Eastern and distribution companies which buy from Texas Eastern and sell natural gas to low priority end users. In discussing the first group, the Commission referred to its past practices in certifying natural gas transportation for low priority end users. Under section 7 of the Natural Gas Act, 15 U.S.C. § 717f, certificates of public convenience and necessity are issued when they are "necessary or desirable in the public interest." The Commission explained that when supplies were adequate, service to large low priority users met this standard because it benefited the entire pipeline. The low priority end user received cheap fuel and costs to the rest of the pipeline's customers were reduced as a result of the increased load factor.[13] But in times of natural gas shortages other customers no longer benefited from continued service to low priority users. Thus, the Commission's decision to cut off or curtail low priority users mirrored its earlier policy of authorizing low priority gas usage only when doing so would benefit higher priority users. In addition, the Commission suggested that shifting the low priority customers' cost of obtaining alternate fuels to high priority users would interfere with the goals of an end use curtailment plan. Compensation payments, it explained, would unduly burden high priority users and might

---

10. *See* Texas Eastern Transmission Corp., Order Accepting for Filing Tendered Tariff Sheets, Suspending Tariff Sheets, Granting Interventions, Providing for Hearing and Establishing Procedures, Docket Nos. RP 71–130 & RP 72–58 (Aug. 30, 1973); J.A. 12.

11. Texas Eastern Transmission Corp., Initial Decision on Remanded Issues Involving Permanent Curtailment Plan, Docket Nos. RP 71–130, RP 72–58 & RP 75–111, at 25 (Aug. 10, 1978); J.A. 42.

12. *Id.* at 26–27; J.A. 43–44. The Con Ed plan exempted small customers from its compensation requirements. *Id.* at 27; J.A. 44.

13. J.A. 13. An increased load factor for the pipeline, resulting from a higher ratio of off-peak to peak load, reduces unit costs for the entire pipeline. *See* P. Garfield & W. Lovejoy, Public Utility Economics 174–78 (1964).

undermine efforts on the part of low priority customers to minimize their costs in alternative energy markets.[14]

With regard to the distribution companies, the Commission found that compensation would unduly reward those companies that had successfully played the "load factor game" in the past by providing service to low priority end users. A distribution company's "load factor" reflects the ratio of average demand to peak demand. *See* P. Garfield & W. Lovejoy, Public Utility Economics 153 (1964). The higher the load factor, or the more demand is pushed from peak to off-peak periods, the lower the distributor's unit costs. Thus, distributors typically sought to raise their load factor: some by providing off-peak service to low priority industrial customers; and others by building storage facilities to hold gas purchased during off-peak periods for resale in periods of peak demand. Not all distributors, however, were able to employ either method for increasing their load factor. These distributors, who generally served small towns in rural areas, simply paid higher prices for natural gas supplies.[15]

The Commission recognized that a consequence of these different methods for increasing load factor is that some residential end users are more severely affected by an end use curtailment plan than others. The heaviest curtailment-related costs fall on customers of distribution companies that had relied on low-priority industrials to increase their load factor. Due to their above average curtailment, these distribution companies must either purchase above average amounts of expensive alternative fuels—which would lead to higher retail prices—or else they must discontinue service to some customers—which would lead to higher unit costs for the remaining customers. In contrast, distribution companies that had invested in storage facilities to increase their load factor or had not played the "load factor game," receive proportionately more natural gas during curtailment because proportionately more of their retail customers are residential users. As a result, these latter distribution companies are under less pressure to increase their retail prices during periods of curtailment.

The Commission found that these disparate effects of curtailment fairly reflect the past load factor strategy of distributors. It reasoned that customers of distributors without industrial loads had paid increased prices in the past due to low load factor or the distributor's costs of constructing and maintaining storage facilities. It concluded "[n]o one earlier suggested during times of plentiful supplies that the benefits obtained from service to industrials should be shared by one distributor with another distributor who did not have an industrial load; and we find no cause to now engage in the reverse process." [16]

The Commission also found that Texas Eastern's demand charge credit adjustment would partially mitigate the impact of end use curtailment on residential customers whose distribution companies had previously maintained a high industrial load. "Demand charges" allocate the fixed costs of a pipeline among its distributor customers. *See* 1 A. Priest, Principles of Public Utility Regulation 337–38 (1969). Through Texas Eastern's demand charge adjustment formula, the demand charge for distribution companies that undergo above average curtailment is credited to reflect capacity that is no longer being served.[17] Thus, during curtailment, a distribution company that stops receiving natural gas for its industrial load bears a decreased share of the pipeline's fixed costs. Although the distribution company's residential customers continue to bear an increased share of the *distributor's* fixed costs, they are not required to bear a disproportionate share of the *pipeline's* fixed costs.

14. Opinion No. 92 at 18; J.A. 90.

15. *Id.* at 19–20; J.A. 91–92.

16. *Id.* at 22; J.A. 94.

17. *Id.* at 23; J.A. 95. *See generally East Tenn. Natural Gas Corp. v. FERC*, 631 F.2d 794, 797 (D.C.Cir.1980).

The Commission then proceeded to consider the implications of the Natural Gas Policy Act of 1978, Pub.L.No. 95–621, 92 Stat. 3350 ("NGPA"). It noted that Title IV of the NGPA ratified the Commission's end use approach to curtailment plans. Although the NGPA did not specifically address the issue of compensation, the Commission suggested that a compensation scheme would be inconsistent with the conference committee's concern with preventing sharp price increases on goods produced by preferred end users.[18] The Commission also considered the implications of the Powerplant and Industrial Fuel Use Act of 1978, Pub.L.No. 95–620, 92 Stat. 3289 (1978) ("Fuel Use Act"). It found that while the Fuel Use Act places more severe restrictions on natural gas usage than a curtailment plan, it only provides for compensation in narrow circumstances. Although the Commission conceded that the Fuel Use Act does not prohibit compensation in the context of end use curtailment plans, it concluded that nothing in that statute suggests that regulation of boiler fuel uses under the Natural Gas Act should be accompanied by compensation.[19]

Turning finally to the particular compensation schemes offered by Elizabethtown and Con Ed, the Commission found that neither scheme would equitably allocate the economic hardship of a natural gas shortage. The Commission first noted that both plans sought to reallocate costs so as to require high and low priority customers to share equally in the economic hardship attending natural gas shortages—an objective the Commission had earlier rejected in its policy discussion. But even assuming that compensation would be appropriate in some circumstances, the Commission found the two proposed schemes to be defective. Elizabethtown's plan, which would compensate curtailed customers for their most expensive supplemental supplies, placed no cap on costs that could be charged to the pipeline. The Commission explained that this plan contained a potential for abuse since customers curtailed at above average rates would have little incentive[20] to minimize their most expensive supplemental supplies—costs which would be passed along to other pipeline customers. The Commission concluded that approving Elizabethtown's plan would be a violation of its duty to avoid exploitation of the ultimate consumer.[21]

Unlike Elizabethtown's plan, Con Ed's compensation scheme would not skew incentives to minimize costs. Con Ed's plan would employ an index of substitute fuel costs—the price of No. 6 residual fuel oil— to determine the excess cost incurred by those customers undergoing above average curtailment. Regardless of the costs they actually incurred, curtailed customers would receive compensation computed by multiplying the difference between the price of fuel oil and the regulated natural gas price times the difference between the company's pro-rata share of natural gas and the amount it actually receives.[22] Thus, each individual pipeline customer would have an interest in minimizing the cost of alternative fuels. Nonetheless, the Commission found that Con Ed's plan also suffered from serious deficiencies. First, it measured compensation by reference to a single alternative fuel, and could therefore distort the actual average costs of conversion. Second, it did not deduct for customers of distribution companies who actually converted to other fuels or otherwise left the distributor's system. Unless state commissions required distributors to direct compensation payments to these customers, who would no longer receive natural gas,

---

18. Opinion No. 92 at 30–31; J.A. 102–03.

19. Opinion No. 92 at 31–32; J.A. 103–04.

20. Elizabethtown's plan did not provide for a complete reimbursement of costs. Thus it left curtailed customers with some incentive to minimize the cost of alternative fuels. *Id.* at 44; J.A. 116.

21. *Id.* at 45; J.A. 117.

22. The customer's "pro-rata" share is the amount of natural gas it would receive if the pipeline company filled the same proportion of each contract. *See* p. 765 *supra.*

the payments would end up in the hands of the distributors' residential customers. In essence, the plan could simply transfer payments from one set of residential customers to another even though the main impact of end use curtailment is on low priority end users. Finally, the Commission compared the actual rates borne by Con Ed's customers and the retail customers of a neighboring utility—Brooklyn Union—whose distributor had not been heavily curtailed. Although it recognized that such comparisons of retail rates are imperfect, the Commission found it noteworthy that this rough comparison did not bear out Con Ed's contention that its customers had been subject to greater rate increases as a result of above average curtailment. The Commission concluded that there was "no basis for awarding either Con Edison or its gas customers compensation."[23]

In its petition for rehearing, Con Ed objected to the Commission's reliance on the low priority historically placed on boiler fuel use as a rationale for denying compensation. It argued that "[u]ntil the onset of deep curtailments in the early 1970's . . . virtually every denial of a boiler fuel sale was reversed in subsequent actions by the Commission."[24] In response, the Commission explained that its past certificate decisions had been made in the context of more plentiful supplies. It concluded that:

The Commission's certificate decisions, thus, do not evidence that neutrality on end-use which would have to be present in order to support utilization of *pro rata* principles in fashioning appropriate curtailment plans; and a key premise of proponents of compensation cannot be justified. The Commission's certificate decisions support the conclusions that there are more preferred and less preferred end uses for natural gas, relative to alternative fuels which are available for those uses, and that a hierarchy based on end-use may be appropriate where a key conclusion in the certificate process, the adequacy of natural gas supplies, is no longer present. Because we are unable to find an indifference in the Commission's certificate decisions to end-use, there is no need to balance end-use curtailment plans with compensation features predicated on *pro rata* concepts.[25]

In its petition for review, Con Ed argues that the Commission erred (1) by not basing its compensation decision on the premise that the economic hardship of curtailment should be allocated according to private contractual arrangements; (2) by relying on the NGPA; (3) by finding that demand and commodity charge adjustments are adequate compensation; (4) by finding that past benefits accorded to customers curtailed at above average rates offset any need for compensation;[26] and (5) by reject-

23. Opinion No. 92 at 51; J.A. 123. The Commission also found that "most of Con Edison's curtailment has been borne by one customer— its own electric and steam system." *Id.* at 47; J.A. 119. Thus, Con Edison's specific claim for compensation directly posed the question "whether compensation should be awarded for . . . low-priority boiler fuel uses?" *Id.* at 47–48; J.A. 119–20. Referring back to its general policy discussion, the Commission concluded that compensation for boiler fuel usage was clearly inappropriate.

24. Proposal by the Federal Energy Regulatory Commission Relating to the Incorporation of Compensation Provisions in Curtailment Plans, Application of Consolidated Edison Co. of New York for Rehearing, Docket Nos. RM 78–4, RP 71 130, RP 72–58 & RP 75–111, at 4 (Sept. 3, 1980); J.A. 211.

25. Proposal by the Federal Energy Regulatory Commission Relating to the Incorporation of Compensation Provisions in Curtailment Plans, Order Pertaining to Compensation, Denying Rehearing, Docket Nos. RM 78–4, RP 71–130, RP 72–58, RP 75–111, RP 72–89, RP 74–49 & RP 76–34, at 7–8 (Dec. 8, 1980); J.A. 228–29.

26. This objection is based on a misreading of the Commission's opinion and is therefore easily disposed of. Con Ed argues that the entire pipeline benefited from industrial loads in times of sufficient natural gas supplies and that such sales were in the public interest. Thus, it concludes, it is inequitable to place on the distributor who supplied such pipeline-wide benefits the burden of paying for higher cost alternative fuels. But as the Commission explained, the benefits to the distributor who increased his industrial load were disproportionate to the benefits to the pipeline. *See id.* at 14–15; J.A. 235–36. It was this disproportionate benefit that led the Commission to conclude that "no legal, equitable, or policy reason supports un-

ing proposed compensation schemes as imprecise. In addition, Con Ed argues that the Commission did not give adequate consideration to the issue of whether a compensation feature should be included in the specific circumstances of Texas Eastern's plan.[27] Finally, Con Ed insists that, absent a compensation feature, Texas Eastern's plan would effectuate a taking of Con Ed's property without just compensation.

## II. ANALYSIS

### A. Statutory Limitations on the Commission's Curtailment Authority

■ Although Con Ed and the Commission often refer to the compensation issue as a matter of fairness,[28] Con Ed's claim that the Commission should have insisted that Texas Eastern employ principles of contract equity raises initially the question whether the Commission acted in accordance with the Natural Gas Act, 15 U.S.C. § 717c(b). If the Natural Gas Act requires that curtailment plans distribute the economic hardship of a natural gas shortage equally among customers of a pipeline, then the Commission abused its authority by approving Texas Eastern's plan without a compensation component. If, however, there is no statutory mandate for such an allocation, the Commission's order must be sustained absent some showing that its grounds for denying compensation were arbitrary and capricious.

The Supreme Court first ruled on the Commission's curtailment powers in *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). Louisiana Power & Light had argued that the Commission's authority over direct sale customers is limited to approving or denying certificates of public convenience. Rejecting this view, the Court ruled that the Natural Gas Act provides the Commission with independent grants of jurisdiction over "(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation." *Id.* at 636, 92 S.Ct. at 1836 (*quoting Panhandle Eastern Pipe Line Co. v. Public Service Commission*, 332 U.S. 507, 516, 68 S.Ct. 190, 194, 92 L.Ed. 128 (1947)). The Court noted that only the second grant of jurisdiction is restricted in scope to sales for resale. Characterizing curtailment regulations as matters regarding *transportation* rather than *rate-setting*, the Court ruled that such regulations are within the Commission's power. Turning to the scope of that power, the Court first stated that the Commission, as an "[agency] created to protect the public interest, must be free, 'within the ambit of [its] statutory authority to

burdening, through compensation, the ones who made the decision to add interruptible industrial load ...." *Id.* at 15; J.A. 236.

27. Con Ed argues that the Commission's history of consistently rejecting compensation plans demonstrates that it was predisposed against requiring compensation here, and that it has shown that it will essentially reject compensation under all circumstances. As neither of these arguments has any merit, there is no need to discuss them extensively. The Commission's prior erroneous belief that it lacked the power to order compensation surely does not bear on its judgment that compensation payments are unwarranted in this case or on its future actions in different circumstances. Since there is no doubt the Commission carefully considered Con Ed's arguments, the only issue before us is whether its grounds for rejecting those arguments are adequate.

28. This characterization of the compensation issue stems from *dicta* in *Elizabethtown I*:

The question of whether, and how, to provide compensation may well turn on the fairness of balancing the benefit accorded a high-priority purchaser with a charge that offsets, at least in part, the added expense imposed by a curtailment plan upon a lower-priority purchaser.

575 F.2d at 889 (footnote omitted). We proceeded, however, to note that "[t]he issue on fairness is an issue of policy for the Commission. Our function is only to consider the issue of law whether the Commission has the legal authority to implement that policy of fairness." *Id.* n.3.

Now, of course, we are no longer asked to speculate about what considerations the Commission may take into account in deciding whether to employ a compensation plan. Instead, we are only concerned with whether the Commission has abused its discretion by approving an end use curtailment plan that lacks compensation provisions.

make practical adjustments which may be called for by particular circumstances.'" *Id.* 406 U.S. at 642, 92 S.Ct. at 1839 (*quoting FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)). The Court then referred to section 4(b) of the Natural Gas Act as the substantive standard which governs the Commission's evaluation of curtailment plans. Section 4(b) provides:

> No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

Con Ed urges there that Texas Eastern's curtailment plan creates "undue" or "unreasonable" discrimination because it fails to treat all customers' contracts equally.[29] It argues that "[r]egulation of the natural gas industry was founded upon contracts between natural gas companies and their customers." Petitioner's Brief 24. In determining who should bear the burden of short supplies, it contends, "[t]he starting point is the contract and equal treatment under it." *Id.* at 28. The Commission's failure to start there, Con Ed concludes, led it "erroneously and arbitrarily to reject a compensation feature in Texas Eastern's curtailment plan." *Id.* at 28–29.

We do not view section 4's mandate against "undue" preferences and "unreasonable" discrimination so strictly. The mere fact that Texas Eastern's plan treats different kinds of contracts for natural gas differently does not mean that the plan is "undu[ly]" preferential or "unreasonabl[y]" discriminatory as to those whose contract rights are affected. As the Commission explained in its original policy statement endorsing end use curtailment plans, contractual commitments do not necessarily serve the public interest in efficiently allocating scarce natural gas supplies. Through its approval of end use curtailment plans, the Commission has sought to protect the public interest by funneling natural gas supplies to those who face the highest conversion costs or for whom curtailment represents the greatest hardship. Insofar as Texas Eastern's curtailment plan properly serves that goal—an issue which has already been settled in a previous proceeding[30]—its disparate treatment of contract holders cannot be described as unduly discriminatory. *See Elizabethtown II*, 636 F.2d at 1332; *see also Elizabethtown I*, 575 F.2d at 889 n.3 (characterizing compensation as a matter of policy). *Cf. American Smelting & Refining Co. v. FPC*, 494 F.2d at 936 (end use curtailment plans do not improperly reallocate natural gas within the meaning of section 7(a) of the Natural Gas Act). The fundamental premise of end use curtailment is that different classes of end users are *not* similarly situated simply because they have equivalent contractual rights. Thus, even though the Commission was empowered to order compensation, *see Elizabethtown I*, 575 F.2d at 888, "compensation ... is not required by the Natural Gas Act in order to avoid discrimination ...." *City of Willcox v. FPC*, 567 F.2d 394, 420 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).[31]

---

**29.** In its brief, Con Ed argued that the Commission's failure to employ pro rata considerations was arbitrary and capricious. *See* Petitioner's Brief at 24–29. In its reply brief, Con Ed reframed this argument in terms of undue discrimination. *See* Reply Brief at 11. The Commission viewed these two issues as one and the same. *See* Opinion No. 92 at 6; J.A. 78.

**30.** *See Elizabethtown II*, 636 F.2d at 1333; note 6 *supra*.

**31.** We do not read this court's opinion in *North Carolina v. FERC*, 584 F.2d 1003 (D.C.Cir.1978) to require a different result. In *North Carolina* the Commission had rejected a compensation scheme because it assumed that it lacked jurisdiction to order compensation. Remanding that case to the Commission, we noted that "[b]ecause of the lasting discrimination inherent in an end use permanent curtailment plan, the level of compensation accorded custome.s enduring heavier-than-average curtailment is a factor bearing on the reasonableness of the plan ...." *See id.* at 1017. The discrimina-

## B. *Consistency With Prior Policy*

Con Ed also cites as error the Commission's rationale that its prior pattern of certification decisions as to the public interest served by low priority uses of natural gas supports its present policy of rarely, if ever, ordering compensation payments. Con Ed argues that while the Commission has designated certain uses of natural gas, such as boiler fuels, as "inferior uses" it has in fact routinely certified sales to boiler fuel facilities. Since end use was not, in fact, a controlling factor in these certification proceedings, it concludes, end use factors cannot now justify a policy of refusing compensation for contract holders who have been curtailed above the average for the pipeline system. Petitioner's Brief at 26.

We think that Con Ed's view of the significance of the Commission's boiler fuel certification decisions misses the mark. Although there is no doubt that the Commission certified boiler fuel usage during times of more plentiful supplies, the reasoning of its certification decisions has considerable bearing on its refusal to require that curtailment plans include a compensation feature. If, indeed, low priority end uses were only certified when doing so would benefit higher priority users, compensation to the low priority users at the expense of the high priority customers would run against prior Commission policy by substituting "definite burdens ... for the indirect benefit previously conveyed." Respondent's Brief at 40.

A review of past Commission decisions demonstrates that the Commission has historically distinguished among different end uses of natural gas, requiring lower priority end users to justify their receipt of natural gas by demonstrating offsetting public advantages.[32] For example, the Commission often justified its decisions to certify sales to boiler fuel users by noting that such a sale would increase the load factor on a pipeline and thereby lead to rate reductions for other customers. *See Michigan Wisconsin Pipe Line Co.*, 32 F.P.C. 737, 740–41 (1964); *Southern Natural Gas Co.*, 14 F.P.C. 243 (1955), *aff'd sub nom. Charleston & Western Carolina Railway Co. v. FPC*, 234 F.2d 62 (D.C.Cir.1956). Similarly, it has approved boiler fuel usage when it would make it economically feasible for a pipeline to deliver gas to a region. *See Houston Texas Gas & Oil Corp.*, 16 F.P.C. 118, 123 (1956), *aff'd sub nom. Florida Economic Advisory Council v. FPC*, 251 F.2d 643 (D.C. Cir.1957), *cert. denied*, 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 (1958). Thus, as the Commission explained in this case, the ul-

---

tion caused by the end use plan in *North Carolina*, however, had not been adequately justified as serving the Commission's policy of protecting high priority end users. *See id.* at 1012. Where curtailment plans have properly served these objectives, compensation is not required. *See City of Willcox v. FPC*, 567 F.2d 394, 420 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).

An end use plan might be unduly discriminatory if it failed to treat those in similar circumstances similarly. In this case, however, there is no indication that Con Ed's residential users are disadvantaged in comparison with other residential users except to the extent that they had previously received load factor advantages. *See* p. 769 *supra.* Indeed the Commission's comparison of Con Ed's and Brooklyn Union's rates indicates that the evidence is to the contrary. *See* Opinion No. 92 at 50–51; J.A. 122–23. In any event, Con Ed has not made such a showing of discrimination in this case.

**32.** We recognize that this court has previously held that the pattern of the Commission's past certification decisions is not sufficiently clear to support a specific scheme of end use priorities. *See American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 944–46 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) (discussing the Commission's characterization of boiler fuel as an inferior use). Thus, in approving end use curtailment plans, we have required a more searching factual inquiry into the propriety of the Commission's priority scheme. *See id.; City of Willcox v. FPC*, 567 F.2d 394, 405–07 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978) (affirming the Commission's designation of boiler fuel as an inferior use on the basis of record evidence). Nevertheless, the Commission's past policy of requiring less-preferred users of natural gas to justify their receipt of gas in terms of benefits to the system has some bearing on the issues in this case. We read the Commission's opinion as relying on this latter policy, rather than any specific end use designation.

timate decision to certify low priority users was premised on the presence of offsetting advantages, or at least the absence of any disadvantages, for higher priority users.

The Commission's past (and present)[33] certification policy is relevant to its current compensation policy because it demonstrates that the Commission has traditionally been opposed to allowing less preferred users of natural gas to impose economic burdens on higher priority users. A compensation scheme would turn this policy around by requiring high priority users to make payments to lower priority users. While the Commission's certification policy certainly does not mandate rejection of a compensation scheme,[34] we agree with the Commission that it supports the Commission's decision to deny compensation in this case.

### C. Implications of the 1978 Energy Acts[35]

■ Con Ed also disputes the Commission's reliance on the NGPA and the Fuel Use Act to support its denial of compensation. Con Ed argues that neither Act directly addressed the compensation issue, although the propriety of compensation provisions was at the time being vigorously con-

tested before the Commission and in the courts. We agree with Con Ed that these Acts do not point clearly in favor or against compensation plans. We do believe, however, that these Acts generally support our conclusion that the decision whether to employ end use or pro rata concepts in allocating the economic hardship of a natural gas shortage is a matter of policy for the Commission.

The Commission sought support for its rejection of compensation schemes in the conference report accompanying the NGPA. It noted that in establishing agricultural uses of natural gas as a matter of relatively high priority,[36] the conference committee expressed its concern that, absent such a provision, food prices would rise sharply in times of shortage. See H.R.Rep.No. 95–1752, 95th Cong., 2d Sess. 114 (1978), U.S. Code Cong. & Admin.News 1978, p. 8800. Compensation payments would similarly undermine this Congressional attempt to curtail agricultural price increases, the Commission concluded, since high priority end users would suffer increased costs during times of shortage.

We find this argument unpersuasive. Although compensation payments would no doubt lead to increased prices for food, and

33. See, e.g., Florida Power & Light Co. v. FERC, 598 F.2d 370, 380 (5th Cir. 1979).

34. Whether the Commission might have determined that its policies in favor of contractual stability, see Permian Basin Area Rate Cases, 390 U.S. 747, 822, 88 S.Ct. 1344, 1388, 20 L.Ed.2d 312 (1968), outweigh policies in favor of protecting high priority end users from economic burdens occasioned by the presence of lower priority end users is not the issue before us. Recognizing that the balance to be struck between these conflicting policies is generally a matter within the Commission's discretion, we decide only that the Commission's chosen balance does not violate the substantive policies of the Natural Gas Act.

35. The five energy acts of 1978 were: the Public Utility Regulatory Policies Act, Pub. L.No. 95–617, 92 Stat. 3117 (1978); National Energy Conservation Policy Act, Pub. L.No. 95–619, 92 Stat. 3206 (1978); Natural Gas Policy Act, Pub.L.No. 95–621, 92 Stat. 3350 (1978); Energy Tax Act, Pub.L.No. 95–618, 92 Stat. 3174 (1978); Powerplant and

Industrial Fuel Use Act, Pub.L.No. 95–620, 92 Stat. 3289 (1978).

36. Section 401(f) of the NGPA, 15 U.S.C. § 3391(f) (Supp. IV 1980), defines high priority users as:

(2) HIGH–PRIORITY USER.—The term "high-priority user" means any person who—

(A) uses natural gas in a residence;

(B) uses natural gas in a commercial establishment in amounts of less than 50 Mcf on a peak day;

(C) uses natural gas in any school, hospital, or similar institution; or

(D) uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property.

Under the NGPA, natural gas for essential agricultural uses may not be curtailed unless the only alternative is to curtail a "high-priority user," and curtailment will not lead to natural gas deliveries for agricultural use below specified use requirements. See 15 U.S.C. § 3391 (Supp. IV 1980).

similarly would burden high priority residential users, compensation payments would not begin to duplicate the dramatic economic dislocations and price consequences stemming from the gas curtailments themselves that led Congress to raise the priority status of agricultural users. In establishing a high priority status for agricultural end users, Congress recognized that many agricultural processes are not readily adaptable to alternative fuels. *See, e.g.,* 123 Cong.Rec. 31,239 (1977) (remarks of Sen. Johnston); *id.* at 31,240 (remarks of Sen. Bumpers). Past cutoffs of natural gas supplies to these users had resulted in wasted food supplies. *See, e.g.,* 124 Cong.Rec. 28,874 (1978) (remarks of Sen. Talmadge) (curtailments required dumping of milk); 123 Cong.Rec. 31,240 (1977) (remarks of Sen. Bumpers) (4.7 million chickens died in Arkansas in Feb. 1977 due to natural gas shortages). Cutoffs had also severely limited the production of agricultural supplies, thereby causing the price of such supplies to increase sharply. *See, e.g.,* 124 Cong.Rec. 28,874 (1978) (remarks of Sen. Talmadge). By allocating natural gas to agricultural users on a priority basis, the NGPA works to prevent these price consequences of natural gas shortages as well as the price effects that would follow from requiring those agricultural users who can convert to alternative fuels to bear the full brunt of paying for high cost alternatives. *See* H.R. Rep.No. 95–1752, 95th Cong., 2d Sess. 114 (1978). Thus, while Congress sought to avoid the type of price shocks caused by past curtailment priorities, we find it a bit farfetched to read into the NGPA a Congressional policy which precludes compensation altogether in curtailment plans.

The Commission also seeks support for its refusal to require compensation in the Fuel Use Act's provisions prohibiting powerplants from using natural gas as a primary energy source after 1990. *See* 42 U.S.C. § 8341 (Supp. IV 1980). The Commission found that while this prohibition is far more restrictive than a temporary curtailment, it limits "compensation" to cases in which the powerplant finds a purchaser for its right to receive natural gas, and even in such a case, limits the supply rights of the purchaser of the contract to those of its original holder. *See* 42 U.S.C. § 8441 (Supp. IV 1980). Thus, if the powerplant would have no right to receive natural gas during periods of curtailment, the purchaser of its contract would also have no right to receive natural gas during such periods. These provisions, however, do not seem to us to lend particularly weighty support to the Commission's rejection of Con Ed's compensation proposal. The Fuel Use Act says nothing about whether curtailed customers should receive compensation payments; it only says that those who do not have a right to the physical receipt of natural gas during periods of curtailment cannot create such a right in those to whom they sell their natural gas contracts. *See* 42 U.S.C. § 8441(g) (Supp. IV 1980). If we were to rule that curtailed customers had a right to receive compensation payments during periods of curtailment, they could no doubt pass that right along to those who purchase their natural gas contracts.

Thus, we cannot agree with the Commission that the Energy Acts provide direct support for its rejection of compensation schemes. We do find, however, that they support our conclusion that the provision of compensation is a matter of policy properly left to the Commission. Read as a whole, the Energy Acts indicate Congressional concern both with protecting high priority end users from cost increases,[37] and with providing compensation, measured by reasonable replacement costs, to lower priority end users when their "contractual interests" in receiving natural gas are transferred in accordance with certain statutory provisions.[38]

---

**37.** Under the NGPA's provisions for incremental pricing, for example, high priority end users are shielded from price increases caused by purchases of new natural gas. *See* 15 U.S.C. § 3343 (Supp. IV 1980). These provisions also protect some low priority end users from the effects of high new natural gas prices. *See* 15 U.S.C. § 3346(c) (Supp. IV 1980).

**38.** Under 15 U.S.C. § 3363(g) (Supp. IV 1980) those from whom natural gas is taken under the President's emergency reallocation authori-

But the Energy Acts are conspicuously ambiguous on the question of how curtailment plans affect contractual interests to receive natural gas—that is, whether a curtailment plan (1) suspends the rights and responsibilities of the parties to natural gas contracts or (2) leaves those pipeline customers who do not receive natural gas with a right to damages (or compensation). Indeed, the compensation provisions of the Acts specifically provide that they only govern contractual interests *as they are affected* by curtailment plans.[39] Congress thus appears to have left the question of *how* curtailment plans affect contractual interests to the Commission to be resolved in accordance with the general policies of the Natural Gas Act and the Energy Acts.[40]

### D. *Adequacy of Demand and Commodity Charge Adjustments*

In its opinion rejecting Con Ed's compensation scheme, the Commission relied in part on provisions in Texas Eastern's curtailment plan that adjust the commodity and demand charges paid by distributor customers curtailed more than the system average. Con Ed argues that these adjustments are inadequate compensation since they do not account for fixed costs on the distributor's system (which must be paid by the remaining customers) or the cost of alternative fuel. *See* Petitioner's Brief at 31. Con Ed suggests that the distributor customer would rather receive the natural gas than such inadequate compensation.

We do not doubt that Con Ed has properly concluded that distributors would prefer receiving natural gas to receiving demand and commodity adjustments. As the Commission points out in its brief, this preference results from the difference between the regulated price of natural gas and its real value, as measured by the price of alternative fuels. While those who receive natural gas only pay the regulated price, curtailed customers such as Con Ed, are left to purchase alternative fuels in markets that are often unregulated. Since commodity and demand charge adjustments only compensate distributors at the regulated cost-based natural gas price, they may not provide sufficient funds to cover the cost of alternative fuels.

We disagree, however, with Con Ed's suggestion that the Commission erred by finding Texas Eastern's demand and commodity charge adjustments to be adequate "compensation." The Commission's consideration of these adjustments followed its policy conclusion that Con Ed was not entitled to full compensation for its replacement fuel costs. Having reached this policy conclusion, the Commission properly examined Texas Eastern's tariff to ensure that Con Ed would not end up paying for natural gas that it would not receive.

### E. *Deficiencies in Con Ed's Proposed Compensation Plan*

Con Ed also contends that the Commission erroneously placed on Con Ed the burden of developing a workable compensation

---

ty are entitled to just compensation from those who receive that natural gas. For most end users, that amount is calculated with reference to the cost of obtaining supplemental gas supplies or synthetic gas. Boiler fuel users, however, are treated separately by the Act. They are entitled to be "made whole," but cannot receive compensation in excess of that provided when boiler fuel usage is prohibited pursuant to 15 U.S.C. § 717z (Supp. IV 1980). Like the compensation provisions of the Fuel Use Act, the compensation provision accompanying section 717z explicitly provides that compensation is only for contractual interests in natural gas as they are affected by curtailment plans. *See* 15 U.S.C. § 717y (Supp. IV 1980). Thus, while the compensation provisions relating to the President's emergency powers provide gen-

eral support for a compensation policy, they do not indicate whether compensation is appropriate in the context of a curtailment plan.

**39.** *See* note 38 *supra* and pp. 775–776 *supra.*

**40.** Although we find that the Commission erred in concluding that the Energy Act support its rejection of compensation schemes, there is no need to remand this case to the Commission. In its opinion, the Commission stated that *each* of its grounds for rejecting compensation supported its decision. *See* Opinion No. 92 at 1; J.A. 83. Thus even if one ground proves to be too weak, the Commission's policy may still stand on its other rationales.

plan. It argues that following general procedures under section 4 of the Natural Gas Act, the party submitting a revised tariff bears the burden of proving that the tariff is just and reasonable. *See* 15 U.S.C. § 717c(e). Thus, since Texas Eastern proposed the end use curtailment plan at issue in this case, it should bear the burden of formulating a reasonable compensation plan. *See* Reply Brief at 24 n.25.

If a compensation plan were necessary to render a curtailment plan just and reasonable, we do not doubt that the burden of establishing a workable plan would rest on the proponent of the plan. But we have previously held that curtailment plans may be reasonable without any compensation features. *See City of Willcox v. FPC*, 567 F.2d at 420; *id.* at 424–25 (Bazelon, J., concurring). Since compensation schemes are not a required part of a curtailment plan, we conclude that the Commission did not err by placing the burden of developing a workable plan on those parties requesting compensation.

Turning to the specific plan proposed by Con Ed, we find that the Commission did not err by concluding that the plan was seriously defective. First, the plan was based on the unrealistic and rigid assumption that curtailed customers would convert to oil. Should oil prices rise by more than alternative fuels, Con Ed's plan would pro-vide windfalls to curtailed customers at the expense of higher priority end users. Indeed, the Commission found that Con Ed's own experience in adjusting to natural gas curtailment indicated that this hypothesis was grounded in experience. Second, Con Ed's plan provided no assurance that compensation paid to distributors would be directed to curtailed end users. Absent such assurance, the plan allowed for payments from one group of residential customers to another which would be disproportionate to any economic burdens associated with end use curtailment.[41] The Commission properly found that these deficiencies demonstrated that Con Ed's plan would not assure an equitable distribution of the economic burden of the natural gas shortage.

### F. Constitutional Claim

In its petition for review, Con Ed argues for the first time that its contractual right to purchase natural gas from Texas Eastern is "property" within the meaning of the fifth amendment and that this property was "taken away" when the Commission approved a curtailment plan that allocates Con Ed's natural gas entitlements to other pipeline customers.[42] Thus, Con Ed concludes, just compensation, measured by the approximate costs of alternative fuels, is constitutionally required.

Although we seriously doubt that Con Ed's claim has any merit,[43] Con Ed's failure

---

41. Unless state commissions require distributors to forward compensation payments to curtailed low priority end users, those payments would lead to reduced rates for residential customers. These residential customers, however, are not the parties who will suffer the costs associated with purchasing replacement supplies. The only costs they will have suffered are their increased shares of the distributor's fixed costs. There is no reason to suppose that these increased shares of the distributor's fixed costs bear any relation to the compensation payments provided under Con Ed's plan.

42. Con Ed's taking claim rests on the difference between its contractual entitlements under general principles of contract law and its entitlements under Texas Eastern's Commission-approved curtailment plan. Con Ed recognizes that, in times of shortage, pipelines cannot fulfill all of their contractual commitments. But it argues that general principles of contract law

would require a fair and equitable distribution of natural gas during a shortage. *See, e.g., Terry v. Atlantic Richfield Co.*, 72 Cal.App.3d 962, 968, 140 Cal.Rptr. 510, 513 (1977). It concludes that when the government departs from a pro-rata scheme for allocating shortages, the parties' underlying contractual rights require that those receiving less than their fair share of natural gas be compensated.

43. There are a number of obvious weaknesses to Con Ed's taking argument. First, it is far from clear that private contractual arrangements are "property" within the meaning of the fifth amendment. Although the Court has stated in broad dicta that "valid contracts are property whether the obligor be a private individual, a municipality, a state or the United States," *see Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *see also* L. Tribe, American Constitu-

to press its constitutional objections before the Commission precludes us from considering them here. Section 19(b) of the Natural Gas Act specifically provides:

> No objection to the order of the Commission shall be considered by the court [of appeals on petition for review] unless such objection shall have been urged before the Commission *in the application for rehearing* unless there is reasonable ground for failure to do so.

49 U.S.C. § 717r(b) (emphasis added). As interpreted by the Court, this statute serves not only to bar petitioners from raising novel issues, but also serves to bar courts of appeals from raising, *sua sponte*, objections that were not pressed before the Commission. *See FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498–99, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955).

Con Ed argues that section 19(b) should not bar its constitutional argument because the taking question is intertwined with its statutory argument, and, indeed, the Commission took note of this connection in its

opinion.[44] It suggests that since we already have the benefit of the Commission's reasoning, we may proceed to consider the taking question on review.

We disagree. The Commission's opinion specifically noted that Con Ed had not couched its compensation argument in constitutional terms, but had relied "solely on the Natural Gas Act." [45] In its petition for rehearing, Con Ed did not challenge this assessment; nor did it attempt to refute the Commission's observation that there would be no merit to a constitutional taking argument. Thus, Con Ed failed to do precisely what section 19(b) requires: namely, to urge its objections in its petition for rehearing so that the Commission could reconsider its rulings prior to judicial review. *Compare City of Pittsburgh v. FPC*, 237 F.2d 741, 749 (D.C.Cir.1956) (if the Commission raises an issue *sua sponte* in its opinion, *and* the issue is raised in a petition for rehearing, it is subject to review by the court of appeals).[46]

---

tional Law 465 n.1 (1978) (suggesting that the fifth amendment incorporates the protections of the Contracts Clause), courts have not previously held impairments of contracts to be takings outside the context of contracts with governments. Second, Con Ed's expectation that it would continue to receive natural gas from Texas Eastern must be evaluated against a background of extensive governmental regulation. Contracts for the transportation of natural gas are subject to the Commission's approval, *see* 15 U.S.C. § 717f(c), and they may be abrogated when the Commission finds that abandonment is in the public interest. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 344, 76 S.Ct. 373, 380, 100 L.Ed. 373 (1956). Thus even if the contract between Con Ed and Texas Eastern contemplated that shortages would be distributed on a pro-rata basis, the contract was always subject to dissolution when necessary to fulfill the public interest. A curtailment plan, providing for abandonments of service during periods of shortages, is surely less of an intrusion on Con Ed's expectation of receiving natural gas supplies. Third, the record in this case indicates that the impact of Texas Eastern's curtailment plan on Con Ed may not be sufficient to constitute a taking. Con Ed suffered an 18 to 24 percentage point greater curtailment than the average customer. *See* Petitioner's Brief at 8. As substantial as such a curtailment may seem, it is hardly the sort of destruction of property interests that is generally required to constitute

a taking of property. *See Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928). Finally, past cases suggesting that compensation at regulated price levels is sufficient when commodities are *physically* appropriated by the government, see *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124–25, 70 S.Ct. 547, 549–550, 94 L.Ed. 707 (1950), suggest that when a contract holder never receives a commodity in the first place, and never pays the government-regulated price provided for by his contract, he is not entitled to compensation over and above the regulated price.

44. *See* Opinion No. 92 at 5 n.4; J.A. 77.

45. *Id.* at 5–6; J.A. 77–78.

46. Con Ed's failure to press its constitutional objection in its petition for rehearing is especially significant since the Commission had already done the job of explaining that the fairness issue could be raised in both statutory and constitutional terms. A different result might be appropriate when statutory and constitutional issues are closely intertwined and neither the parties before the Commission, nor the Commission itself, treats them as separable issues. *Cf. NLRB v. Blake Construction Co.*, 663 F.2d 272, 283–84 (D.C.Cir.1980) (objections regarding scope of complaint, substantiality of evidence, and ALJ's conduct of proceeding adequate to preserve due process objections).

## CONCLUSION

In conclusion, we find that the Commission has adequately justified its refusal to require Texas Eastern to provide compensation measured by replacement costs to customers curtailed more than the system average. We therefore affirm the Commission's rulings in this case.